Argued and submitted September 27, 2012, remanded for resentencing; otherwise affirmed November 14, on respondent's motion to dismiss and petition for reconsideration filed December 12, 2013, appeal dismissed as moot February 12, 2014
See 261 Or App 113, 323 P3d 275 (2014)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEPHEN MICHAEL BURNS,
*Defendant-Appellant.*

Marion County Circuit Court
10C44374; A147455

314 P3d 288

Laura E. Coffin, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Doug M. Petrina, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Wollheim, Presiding Judge, and Nakamoto, Judge, and Edmonds, Senior Judge.

NAKAMOTO, J.

Edmonds, S. J., concurring in part, dissenting in part.

## NAKAMOTO, J.

Defendant appeals a judgment of conviction for two counts of criminal mistreatment in the first degree, ORS 163.205,[1] for knowingly causing physical injury to two of his children by repeatedly striking or "spanking" them severely enough to produce large bruises on their buttocks. The issue on appeal is whether the two spankings constitute a single criminal episode or two separate criminal episodes for purposes of sentencing. The trial court concluded that the two spankings constituted separate criminal episodes. Defendant contends that the trial court improperly sentenced him when it relied on that conclusion as a basis for enhancing defendant's criminal history score. The state argues that defendant's appeal is not justiciable because it depends on hypothetical future events and that, regardless, the trial court correctly determined that defendant's offenses constituted separate criminal episodes. We conclude that defendant's appeal is justiciable and that the trial court erred when it concluded that each spanking comprised a separate criminal episode. We remand for resentencing.

## I. FACTS

The salient facts are not in dispute. Defendant, a single father, was living with his three children (A, K, and S). Defendant awoke one morning to find that the children had made a mess in the bathroom. Defendant was angry with the children and ordered them to return to their bedroom. K and S shared a bunk bed in the room and, A had a separate bed in the same room. Defendant struck all three children. Defendant first spanked A, who did not sustain any injuries. The state did not charge defendant for that conduct. Next, defendant walked to the bottom bunk bed and spanked S several times. After striking S, defendant stood on the bottom bunk to reach K on the top bunk. Defendant struck K 15 to 25 times, saying, "Don't do that again" and "How many times do I have to tell you; don't do that." Both K and S sustained injuries as a result of the spanking.

---

[1] Under ORS 163.205, "[a] person commits the crime of criminal mistreatment in the first degree if * * * [t]he person, in violation of a legal duty to provide care for a dependent person * * * knowingly * * * [c]auses physical injury or injuries to the dependent person * * *."

The state charged defendant with two counts of criminal mistreatment in the first degree in violation of ORS 163.205. A jury found defendant guilty on both counts. Before sentencing, the state filed a memorandum in which it argued that defendant's two offenses constituted separate criminal episodes and that the court should use the conviction for Count 1 as criminal history for sentencing on Count 2. At sentencing, defendant argued that the two offenses were part of the same criminal episode and that, therefore, the trial court could not use the conviction Count 1 as criminal history for Count 2.

The trial court concluded that defendant's offenses constituted two separate criminal episodes. The court categorized defendant as a "7H" offender on Count 1 and sentenced him to a probationary term of 36 months—within the presumptive range for that grid block. The trial court then used that conviction as part of defendant's criminal history for purposes of imposing sentence on Count 2 and therefore calculated defendant as a "7D" offender on that count. However, for Count 2, the court did not impose the presumptive sentence under 7D, 19 to 20 months of incarceration. Instead, the court imposed a downward dispositional departure sentence of 36 months on probation, the same sentence that defendant received under grid block 7H for Count 1.

On appeal, defendant challenges the trial court's use of his conviction on Count 1 as criminal history when sentencing him on Count 2. Defendant asserts that the trial court erred by concluding that the offenses constituted separate criminal episodes. The state argues that the trial court correctly ruled and, as a threshold matter, that defendant's claim is not justiciable.

## II. THE SENTENCING GUIDELINES

We begin with a discussion of the relevant aspects of Oregon's sentencing guidelines. "In 1987, the Oregon legislature authorized the Oregon Criminal Justice Council [(the council)] to develop a set of mandatory felony sentencing guidelines * * *." *State v. Davis*, 315 Or 484, 486, 847 P2d 834 (1993) (footnote omitted). The legislature also created the State Sentencing Guidelines Board (the board) to serve

as the administrative body that would adopt and promulgate the guidelines in the form of administrative rules. *Id.*; *State v. Miller*, 317 Or 297, 300-01, 855 P2d 1093 (1993). The board completed that task and the legislature approved the guidelines in 1989. *Davis*, 315 Or at 486-87.

The guidelines were developed to address two overarching concerns: inconsistent sentencing practices and overcrowding in Oregon's prisons. This is evident from the preamble to the implementing legislation, which provides, in part:

> "[T]he Legislative Assembly finds that within the present system it is impossible to insure that the sentencing decisions of judges result in reasonably uniform and proportional use of state and local correctional resources; and

> "* * * the decision to imprison offenders and decisions as to the period of such imprisonment must be made on a systematic basis that will maintain institutional populations within a level for which the Legislative Assembly and the people of the state are prepared to provide[.]"

Or Laws 1987, ch 619; *State v. Davis*, 113 Or App 118, 121, 830 P2d 620 (1992), *aff'd*, 315 Or 484, 847 P2d 834 (1993) (referring to the preamble as articulating the policy underlying the guidelines); *State v. Seals*, 113 Or App 700, 704, 833 P2d 1344 (1992) (same); Laird C. Kirkpatrick,[2] *Mandatory Felony Sentencing Guidelines: The Oregon Model*, 25 UC Davis L Rev 695, 697 (1992) ("[P]roponents [of the guidelines] argued that the guidelines could reduce current prison overcrowding and prevent future overcrowding."). The rules and the implementing legislation both note that the "primary objectives" of the guidelines are "to punish each offender appropriately, and to insure the security of the people in person and property,' *within the limits of the correctional resources.*" OAR 213-002-0001(1) (emphasis added); *see also* Or Laws 1987, ch 619, § 2(2) (containing

---

[2] Professor Kirkpatrick was a member of both the council and the board at the time the guidelines were developed and promulgated. Kirkpatrick, 25 UC Davis L Rev at 695. The Oregon Supreme Court, in *Davis*, its "first significant excursion * * * into the sentencing guidelines," 315 Or at 486, described Kirkpatrick's account of the development of the guidelines as "a comprehensive treatment of the history and operation of the Oregon felony sentencing guidelines[.]" *Id.* at 486 n 2.

substantially similar language); OAR 213-002-0001(3)(a) ("The response of the corrections system to crime * * * must reflect the resources available for that response. A corrections system that overruns its resources is a system that cannot deliver * * *.").

Based on that policy, the council developed the centerpiece of the guidelines, the 99-block Sentencing Guidelines Grid. Kirkpatrick, 25 UC Davis L Rev at 700-01; *Davis*, 315 Or at 487; *see also* OAR ch 213, app 1 (setting out the grid). The grid was based on the council's conclusion that "the two primary determinants of an appropriate sentence should be the seriousness of the crime and the offender's criminal history." Kirkpatrick, 25 UC Davis L Rev at 701. A sentencing judge uses the grid to determine the proper sentence for a given conviction by, first, identifying the appropriate category for the crime of conviction on the vertical crime seriousness scale; then, determining the appropriate category for the convicted offender on the horizontal criminal history scale; and, finally, locating the grid block where the two categories intersect. *Davis*, 315 Or at 487.

The criminal history scale classifies an offender's history according to the number and nature of the offender's prior convictions. OAR 213-004-0006(1). The scale consists of nine categories, ranging from "A" (the highest) to "I" (no criminal history). *Id.* In establishing criminal history as one of the two determinants of a given sentence, the council reasoned that

> "greater severity is justified when the offender has been convicted previously but has continued to engage in criminal conduct. Because authorities generally consider criminal history one of the best predictors of an offender's likelihood to engage in future criminal conduct, consideration of criminal history is relevant to both appropriate punishment and protection of public safety."

Kirkpatrick, 25 UC Davis L Rev at 701.

The rule at issue here, OAR 213-004-0006(2), governs the determination of the appropriate criminal history category, or "score," for a given conviction. *State v. Bucholz*, 317 Or 309, 311-12, 855 P2d 1100 (1993) (stating that *former* OAR 253-04-006 is "the governing rule for calculation of

criminal histories"); *State v. Allen,* 151 Or App 281, 283 n 1, 948 P2d 745 (1997) (noting that, "[i]n late 1995, the sentencing guidelines * * * were shifted from OAR chapter 253 to chapter 213"). Specifically, OAR 213-004-0006(2) provides, in part:

> "An offender's criminal history is based upon the number of adult felony and Class A misdemeanor convictions and juvenile adjudications in the offender's criminal history at the time the current crime or crimes of conviction are sentenced."

The sentencing judge must determine the offender's criminal history by a preponderance of the evidence at the sentencing hearing (unless the offender admits his criminal history in open court). OAR 213-004-0013(1).

The rule was intended to advance the two primary objectives of the guidelines, discussed above, by promoting consistency in sentencing so as to mitigate prison overcrowding. *See* Commentary to Oregon Sentencing Guidelines Implementation Manual, 51 (1989) (the commentary)[3] ("[T]he legislative intent [of the rule] was to capture as accurately as possible the offender's criminal record at the time of sentencing without encouraging the manipulation of court proceedings as a means to affect the offender's criminal history classification."); *Seals,* 113 Or App at 703 (holding that that commentary "accurately reflects the legislative intent"); *see also id.* at 704 (noting that legislators agreed, after discussing "the impact of the rule on projected prison populations[,]" that the rule was not intended to be interpreted in a way that would "result in increased prison population" and that "[t]hat understanding of [the rule] comports with the principle underlying the guidelines to punish offenders within the limits of correctional resources").[4]

---

[3] Authored by the council, the Oregon Sentencing Guidelines Implementation Manual contains the board's official commentary to each of the rules comprising the guidelines. *Davis,* 315 Or at 493 n 14.

[4] The following testimony from the same legislative session—at which the rule was approved—demonstrates that the legislature recognized that the rule was susceptible to two meanings, only one of which would effect the legislature's intent:

> "'By counting criminal history from date of sentencing, offenders who are being sentenced for multiple offenses could have counted in their criminal history * * * the current multiple offenses, because they have been theoretically

Each grid block states a presumptive sentence range for offenders whose crime of conviction and criminal history place them in that grid block. OAR 213-004-0001(2). A sentencing judge must impose a presumptive sentence within the range dictated by the appropriate grid block, unless the factfinder finds "substantial and compelling" reasons in aggravation or mitigation, in which case the judge may depart from the presumptive range. OAR 213-008-0001. A sentence that imposes probation when the presumptive sentence is prison, or *vice versa*, is known as a "dispositional departure." OAR 213-003-0001(6).

When an offender violates a condition of probation, a court may revoke the offender's probation and impose a prison term as a sanction. OAR 213-010-0001; OAR 213-010-0002. For offenders whose probationary sentence resulted from a dispositional departure, the sanction upon revocation is a prison term up to the maximum presumptive prison term that could have been imposed under the presumptive sentence. OAR 213-010-0002(2). Accordingly, in this case, although defendant received a dispositional departure of probation on the second count of conviction, if his probation is revoked and he is sentenced to a term of incarceration as a sanction, he could be sentenced to serve 19 to 20 months in prison. By contrast, had the trial court sentenced defendant as a 7H offender, as defendant argues the court should have, the maximum permitted revocation sanction would be just six months. As a threshold issue, the state focuses on the hypothetical nature of defendant's future probation violation and the court's subsequent revocation of probation and imposition of a prison term as a sanction to argue that defendant's appeal is not ripe and, therefore, not justiciable.

### III. RIPENESS

Oregon statutory law specifically provides that an "appellate court may review a claim that *** [t]he sentencing court erred in *** determining the appropriate

---

convicted of them and that's what's driving those numbers up. If the intention of the committee is only to count as prior convictions, convictions unrelated to the current, then the impact figures would be very low.'"

*Seals*, 113 Or App at 704 (quoting Tape Recording, House Committee on Judiciary, Subcommittee on Crime, June 20, 1989, Tape 103, Side A (statement of council staff member Ashford)).

classification of a prior conviction * * * for criminal history purposes[.]" ORS 138.222(4)(b). Nevertheless, the state asks this court to dismiss defendant's appeal as nonjusticiable. To be justiciable, the controversy must involve "present facts" as opposed to "a dispute which is based on future events of a hypothetical issue." *Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982); *accord Hazell v. Brown*, 352 Or 455, 480, 287 P3d 1079 (2012).

The state argues that defendant's appeal is not ripe, and thus not justiciable, because it concerns a harm that may or may not occur, depending on multiple hypothetical future events. The state reasons that, even though the trial court calculated defendant as a 7D offender on Count 2, as a result of the court's downward dispositional departure on that count, defendant ultimately received the same sentence that he would have received had the court sentenced him as a 7H offender. Thus, contends the state, the alleged error does not affect defendant's "actual sentence," and a decision by this court on the accuracy of the trial court's grid block calculation would, therefore, have no current effect. Defendant counters that his appeal is ripe now. Defendant points out, and the state concedes, that defendant's appeal represents his sole opportunity to assign error to the trial court's grid block calculation in this court. We conclude that defendant's appeal is justiciable.

As noted above in our discussion of the guidelines, a grid block dictates more than just the present sentence to be imposed. The state acknowledges that, were a court to revoke defendant's probation and impose a revocation sanction as to Count 2, as a 7D offender, defendant would be subject to a sentence of up to 20 months in prison. A 7H offender, on the other hand, would be subject to a sentence of no more than six months. Furthermore, as the state concedes, it is well established that, when imposing a revocation sanction, a court may not recalculate the defendant's criminal history score. *State v. Anderson*, 243 Or App 222, 228, 258 P3d 1244, *rev den*, 350 Or 716 (2011). Therefore, even when a court initially has inaccurately assessed the offender's criminal history score, that determination is binding in subsequent revocation proceedings. *State v. Bolf*, 217 Or App 606, 609, 176 P3d 1287 (2008); *State v. Hoffmeister*, 164 Or

App 192, 196, 990 P2d 910 (1999). Were defendant to violate probation and face sanction at a revocation proceeding, he would thus be unable at that stage to challenge the trial court's calculation of his criminal history.

The state relies primarily on *State v. Tallman*, 190 Or App 245, 78 P3d 141 (2003), to buttress its argument, but that case is distinguishable. In *Tallman*, the trial court sentenced the defendant under a grid block that carried a presumptive sentence (and, thus, a maximum possible revocation sanction) of 19 to 20 months' incarceration. *Id.* at 247. The court then declared that, should the defendant violate probation, the defendant would receive a revocation sanction of 36 months' incarceration, a term exceeding the maximum duration permitted by the guidelines. *Id.* The state appealed, arguing that the probation revocation sentence was unlawful because it exceeded the maximum duration permitted by the guidelines. *Id.* at 247-48. Thus, the state in *Tallman* did not argue, as defendant does here, that the trial court erred when it calculated the criminal history score. Rather, the court in *Tallman* imposed the defendant's sentence based on the correct grid block; the alleged error was the potential revocation sanction. Defendant here argues, in effect, the opposite, assigning error to the court's actual grid block calculation, not to the merely potential or hypothetical revocation sanction.

That distinction begets, in turn, two additional and significant differences between the instant case and *Tallman*. In *Tallman*, we ultimately concluded that the state's challenge to the potential revocation sanction was not yet ripe because it depended on a series of hypothetical future events.[5] We reasoned, specifically, that the defendant's "probation has not been revoked, and *we cannot be certain that, if it is revoked, the trial court will impose a 36-month incarceration term.*" *Id.* at 250 (emphasis added).

_____

[5] The state is correct that defendant may never be subject to a revocation sanction and that, to that extent, defendant's appeal involves, in part, hypothetical events. That fact, by itself, however, does not automatically make defendant's appeal premature. *See, e.g., McIntire v. Forbes*, 322 Or 426, 434, 909 P2d 846 (1996) (concluding that, although operation of the legislation challenged in that case was "contingent" on funding that "may or may not be committed[,]" "[t]hat uncertainty * * * does not prevent ripeness for decision").

As that makes clear, a future revocation court in *Tallman* would have retained the discretion to forgo imposition of the allegedly improper sanction. As noted above, under *Anderson, Bolf,* and *Hoffmeister,* such a court in this case would not have that discretion. Thus, the potential harm faced by the defendant in *Tallman* was substantially more contingent than the harm faced by defendant here.

Additionally, we noted in *Tallman* that the occurrence of the requisite hypothetical events *would* render the issue ripe for appeal. 190 Or App at 250. In other words, the state and the defendant in *Tallman* ultimately could have challenged the 36-month revocation sentence, were a court to impose it. As we have noted, defendant in this case would not enjoy the same opportunity. Collectively, those distinctions make *Tallman* inapposite.[6]

A holding by this court that defendant's appeal is not yet justiciable would foreclose defendant's only possible avenue for challenging the trial court's criminal history determination. We find that fact to be dispositive of the question of ripeness in this case. We conclude that the "now or never" nature of defendant's assignment of error renders his appeal justiciable now.

## IV. SAME CRIMINAL EPISODE

We turn now to the merits analysis. For the reasons that follow, we agree with defendant that the trial court improperly sentenced him as a 7D offender on Count 2, because the two spankings were part of the same criminal episode and his conviction on Count 1 thus cannot be counted as part of his criminal history under OAR 213-004-0006(2).

---

[6] The state cites to two other cases, *State v. Gutierrez,* 199 Or App 521, 112 P3d 433 (2005), *rev den,* 340 Or 673 (2006), and *State v. Smith (134313),* 223 Or App 250, 195 P3d 467 (2008), in support of its ripeness argument. Those cases are similarly inapposite. *Smith* involved significantly distinct procedural facts and a possible future harm several degrees more speculative than the possible adverse consequences in this case. In *Gutierrez,* the defendant failed to preserve the relevant assignment of error, and the court concluded that, therefore, it would not consider the defendant's argument that the trial court erred in augmenting the length of his probationary sentence, even though that alleged error could result in a maximum revocation sentence of six months. 199 Or App at 524 n 2 ("In future cases, our decision may be influenced by a demonstration that the likelihood that the harm asserted will materialize is greater or that the harm risked is considerably more onerous than here.").

We begin with the relevant framework for our analysis. Under Oregon courts' current interpretation of the criminal history rule, a sentencing court may not use a conviction as criminal history when calculating the sentence for another conviction from the same proceeding unless the underlying offenses arose from separate and distinct "criminal episodes." *Bucholz*, 317 Or at 317; *State v. Witherspoon*, 250 Or App 316, 321, 280 P3d 1004 (2012). This court has observed that "criminal episode" is a term that "has been used in so many diverse statutory and constitutional contexts within the criminal law that its precise meaning in any given context, much less its origins, is not always clear." *State v. Potter*, 245 Or App 1, 6, 260 P3d 815 (2011), *rev den*, 351 Or 586 (2012); *see also State v. Bryant*, 245 Or App 519, 522, 263 P3d 368 (2011) ("[T]he term 'criminal episode' appears in many different contexts, and its meaning can vary with the context in which it is used."). In the context of calculating a defendant's criminal history score, we have previously applied ORS 131.505(4), the statutory definition of "criminal episode" that governs our double jeopardy analysis. *See, e.g.*, *Witherspoon*, 250 Or App at 322-25; *Allen*, 151 Or App at 291-92. Under ORS 131.505(4), crimes arise from the same criminal episode when they are part of "continuous and uninterrupted conduct that * * * is so joined in time, place and circumstances that such conduct is *directed to the accomplishment of a single criminal objective.*" (Emphasis added.)

The question of whether events constitute a single criminal episode is a question of law that, in turn, may depend on predicate findings of historical fact. *State v. Potter*, 236 Or App 74, 82, 234 P3d 1073 (2010). If the trial court made such findings in accordance with the evidence, we may not disturb them. *State v. Fore*, 185 Or App 712, 716, 62 P3d 400 (2003); *see also State v. Yashin*, 199 Or App 511, 514, 112 P3d 331, *rev den*, 339 Or 407 (2005) ("The legal determination that convictions arose out of separate criminal episodes is based on a factual finding * * * that the acts giving rise to the convictions were not part of continuous and uninterrupted conduct that * * * is so joined in time, place, and circumstance that it is directed to the accomplishment of a criminal objective.") (first ellipsis added; second ellipsis in

original; internal quotation marks omitted). Accordingly, we consider whether there is evidence in the record sufficient to support the trial court's factual findings and review the court's application of the law to those facts for legal error. *Witherspoon*, 250 Or App at 323; *Fore*, 185 Or App at 716.

In this case, applying the definition of criminal episode in ORS 131.505(4), the trial court concluded that defendant's conduct constituted separate criminal episodes. As we discuss in more detail below, the legislative history of ORS 131.505(4) illuminates that definition and supports defendant's contention that the trial court's conclusion was incorrect.

The court based its legal conclusion that there were multiple criminal episodes on the fact that defendant struck each of his children in turn. As the court articulated to defendant at the sentencing proceeding,

> "[t]he evidence before the Court is the testimony of [K] in which he testifies that you went to each of these beds. * * * That his brother was spanked in the lower bunk, * * * and that after you finished that you climbed up so that you could reach him on the upper bunk, and that you were holding him down at the time you were spanking him repeatedly."

Based on that, the court found that "there was sufficient interruption both in terms of time and location, that [defendant] had the opportunity to appreciate the criminality of each act" and that "there was an intention to separately punish each of the children."[7] The court concluded that, therefore, defendant "had two distinct objectives in abusing, mistreating each of these children."

---

[7] It appears from this that the trial court may have conflated ORS 131.505(4), defining "same criminal episode," with ORS 161.067(3), which does not pertain to the criminal history rule or the definition of "same criminal episode" but does withhold merger of offenses where "a sufficient pause in the defendant's criminal conduct * * * afford[ed] the defendant an opportunity to renounce the criminal intent." As we noted above in our reference to *Potter*, 245 Or App at 6, the question of what constitutes a "criminal episode" is relevant to several areas of criminal law. We take this opportunity to reiterate that this opinion deals *only* with the question of what constitutes a criminal episode for purposes of calculating a defendant's criminal history score at sentencing, and not with any of those other areas of law. In particular, we underscore that this case does not involve a question of merger under ORS 161.067.

As the text of ORS 131.505(4) indicates, the "critical factor in treating criminal conduct as a unitary event * * * is not the coincidence of 'time, place and circumstances' as such, but the resulting inference that the conduct is 'directed to the accomplishment of a single criminal objective.'" *State v. Cloutier*, 286 Or 579, 595, 596 P2d 1278 (1979). The legislative history of ORS 131.505(4), found in the Commentary to the Proposed Oregon Criminal Procedure Code, makes clear that the determination whether conduct is "directed to the accomplishment of a single criminal objective" is "an objective determination." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Procedure Code, Final Draft and Report § 26, 17 (Nov 1972) (commission commentary). Furthermore, acts separated by a short period of time and conducted in different locations may still be part of a single criminal episode. For example, on hypothetical facts of a defendant who enters a convenience market at night, robs the market by making the lone female clerk give him the money, and then takes the clerk to the back room and rapes her, the commission commentary states that the defendant's conduct is "continuous and uninterrupted" and "closely joined in 'time, place and circumstances'" and could be considered as a single criminal episode if the defendant's objective is viewed as rape, with the robbery preliminary to the rape, or if the defendant's overall objective was to commit both robbery and rape. *Id.* at 17-18. Or, in another example, the defendant steals a car at 9:00 p.m., robs a market at 9:30 p.m., and then flees in the stolen car; the analysis results in "[o]ne criminal episode consisting of the crimes of theft and robbery." *Id.* at 18. As Justice Walters recently observed in her concurrence to the Supreme Court's *per curiam* dismissal of the petition for review in *State v. Campbell*, 354 Or 375, 379, 312 P3d 511 (2013) (Walters, J., concurring), the legislative history of the definition of "criminal episode" contains numerous examples that, together, illustrate that the concept of a "single criminal objective" is not narrow and, instead, that various acts by the defendant should be viewed as part of the same criminal objective, "as long as they reasonably can be seen to be directed toward a single overarching criminal objective." Hence, defendant's challenge to the trial court's calculation of his criminal history reduces to the question of whether

the spankings can reasonably be seen to be directed to the accomplishment of a single overarching criminal objective or instead manifest multiple criminal objectives on his part.

Defendant asserts that there was one single criminal objective—to strike his children for the mess that he believed they jointly made. The state counters that defendant made a discrete, deliberate decision to commit each offense and that, therefore, defendant's conduct involved separate criminal objectives. The state reiterates the trial court's reasoning that the break in time between spankings, momentary though it was, nevertheless allowed defendant to "appreciate the criminality" of his conduct, and that, thus, defendant must have formed a separate and additional criminal objective in striking the second child. Under such circumstances, asserts the state, each act against each child necessarily represents a new and distinct criminal objective. That is also the gravamen of the dissent's analysis, with its conclusion that more than one criminal episode occurs as a matter of law if a defendant directs separate actions at separate victims. *See* 259 Or App at 438 (Edmonds, S. J., dissenting).

We have previously concluded that "that kind of parsing of defendant's criminal objective is inconsistent with the intent of ORS 131.505(4)." *State v. Kautz*, 179 Or App 458, 467, 39 P3d 937, *rev den*, 334 Or 327 (2002); *accord Witherspoon*, 250 Or App at 324. "The Supreme Court cautioned in [*State v. Boyd*, 271 Or 558, 565 n 4, 533 P2d 795 (1975),] against construing the phrase 'directed to the accomplishment of a single criminal objective,' too narrowly." *Witherspoon*, 250 Or App at 325 n 5. Indeed, the Supreme Court has noted that, as used in ORS 131.505(4), "the concept of an actor's 'objective' * * * refers to the pursuit of some object or attainment of some goal beyond the successful commission of the acts constituting the offense charged" and that "to reduce the 'objective' to this would rob it of its intended significance." *Cloutier*, 286 Or at 599 n 21. The court in *Cloutier* explained that, "in ORS 131.505(4), * * * the revised criminal statutes have chosen to attach importance to the 'singleness' of a defendant's criminal objective rather than only to the 'singleness' of his acts." *Id.* at 596;

*see also id.* at 598 (discussing "the commission of *offenses against several victims in a single criminal act or episode,* offenses which * * * span events of such diverse penological significance as the traffic offense that fortuitously results in the death of many * * *, and the calculated decision of a robber to empty not only the cash register but also the purses of the individual employees or guests of the establishment" (emphasis added)).

Thus, we have held repeatedly since *Boyd* and *Cloutier* that, at least in the context of determining an offender's criminal history score, a defendant's conduct in pursuit of a goal arose from one criminal episode even when the defendant committed multiple acts over a course of minutes or, in one case, even hours. *See, e.g., Allen,* 151 Or App at 292 (concluding that a conviction for assault resulting from DUII cannot be used as criminal history for felony hit-and-run for fleeing the scene of the accident); *State v. Thomas,* 187 Or App 192, 194-95, 66 P3d 570 (2003) (state conceding same); *Bryant,* 245 Or App at 521 (state conceded that all counts arose from the same criminal episode in which defendant assaulted two separate victims). Our recent decision in *Witherspoon,* which involved acts occurring over a course of hours, is particularly instructive.

In that case, the defendant was convicted of two counts of assault and one count of menacing after a prolonged domestic violence episode that lasted more than five hours and involved numerous separate acts by the defendant against the victim. *Witherspoon,* 250 Or App at 318-19. The defendant's conduct included forcing the victim, his wife, to hold a knife to the defendant's neck while yelling at her to stab him with it, which was the basis for the menacing count (Count 2). *Id.* at 319. After the victim fled to another room and attempted to call 9-1-1, the defendant pulled the phone cord from the wall, and the victim then fled to a third room, where the defendant assaulted her, which was the basis for Count 4. *Id.* At sentencing, the state asked the court to include the defendant's conviction on Count 2 as part of his criminal history score in sentencing him on Count 4. *Id.* The state reasoned that, because there was a break in time between the events that occurred in the different rooms, Count 4 arose from a separate episode than Count 2. *Id.* at

320. The trial court stated that it had no "problem finding that [Count 4] was separate and came later" and used the conviction on Count 2 as criminal history when sentencing on Count 4. *Id.*

We remanded for resentencing, holding that the assault and the menacing were part of the same continuous and uninterrupted criminal episode. *Id.* at 326. Although the offenses took place over a greater period of time and farther apart in terms of distance than did the two spankings in this case, we concluded that the assault and menacing in *Witherspoon* shared a common criminal objective, namely, "harassing and injuring the victim through physical and emotional abuse." *Id.* at 324. Had we applied the rule that the state and the dissent argue for in this case, each act taken by the defendant against his wife would have amounted to a separate and distinct episode based solely on the separation in time and space between the incidents. We were not persuaded by that argument in *Witherspoon* and are not persuaded by it now. *See also Kautz,* 179 Or App at 460, 466-67 (in a different sentencing context, rejecting the state's argument that the defendant's separate acts in the course of a "crime spree" that resulted in convictions for both robbery and burglary arose from separate criminal episodes, and holding that the defendant's acts were directed to "the same criminal objective" of stealing property, although the robbery occurred after the burglary, when the victim discovered that the defendant was leaving in the victim's car and tried to stop him). To agree with the state and the dissent would contravene the legislative history of ORS 131.505(4). We conclude that the trial court erred by adopting the state's position, advanced now as well by the dissent, which amounts to precisely the kind of reductionist collapsing of objective and act that the Supreme Court and we have rejected in both theory and practice.

We are likewise unpersuaded by the state's resort to *State v. Kessler,* 297 Or 460, 466, 686 P2d 345 (1984)—a case that predates the sentencing guidelines by several years and, as the dissent concedes, does not discuss the criminal history rule at all but, rather, involves a different issue altogether (whether to merge convictions for purposes of a cumulative sentence). The state relies on *Kessler* to

argue that the presence of multiple victims in this case justifies the trial court's use of the first spanking as criminal history. We disagree. In fact, *Kessler* is consistent with the legislative history of ORS 131.505(4) and demonstrates that a single criminal episode may involve separate acts directed at a number of separate victims.

*Kessler* involved a situation in which six inmates escaped from jail by first summoning and then locking up each of four lay ministers, whose clothes the inmates stole, and then taking two corrections officers hostage and forcing them to escort the inmates out of the jail. *Kessler,* 297 Or at 467. The defendant pleaded guilty to, *inter alia,* four counts of second-degree kidnapping, one for each of the lay ministers, and two counts of first-degree kidnapping for the hostage-taking incident involving the correctional officers. *Id.* at 462. The trial court first imposed four sentences, one for each kidnapping of a lay minister, then imposed separate sentences for each kidnapping of a correctional officer, and then ordered all of the sentences to be served consecutively. *Id.* On appeal, we noted that there were only two criminal episodes: a single criminal episode involving the kidnappings of the lay ministers and a single criminal episode involving the kidnappings of the correctional officers. *State v. Kessler,* 65 Or App 380, 382, 671 P2d 749 (1983), *rev'd on other grounds,* 297 Or 460, 686 P2d 345 (1984). We then concluded that, under *State v. Linthwaite,* 295 Or 162, 665 P2d 863 (1983), because of the defendant's conviction on multiple counts for the same crime in each of the two criminal episodes, we were obliged to merge the convictions for sentencing and to allow only one sentence for the kidnappings of the ministers and only one sentence for the kidnappings of the correctional officers. *Kessler,* 65 Or App at 382.

The Supreme Court accepted our premise that there was a single criminal episode involving the four kidnappings of the ministers and a separate criminal episode involving the two kidnappings of the correctional officers. For example, the court stated, "The Court of Appeals misconceived its role in appeals from multiple sentences when it thought that *Linthwaite* provided a single rule for all cases involving *several victims in a single criminal episode.*" 297 Or

at 468 (emphasis added). The court also described the kidnappings of the four ministers as a single criminal episode. *Id.* at 467 ("Each of the civilian victims was summoned for a purpose, to obtain his clothing for one of the prisoners. Each was locked up in order to prevent interference with the escape. *This kidnapping episode* achieved its intermediate object in the larger scheme toward the ultimate objective of escape." (Emphasis added.)). The court disagreed, though, with our view of sentencing possibilities under *Linthwaite* in those circumstances. 297 Or at 468.

The dissent also invokes *Kessler* to support its argument that, because there is no "controlling statute, legislative history, or case directly on point," we should honor what the dissent considers to be the most probable legislative policy, namely, one that favors punishing offenders for separate acts against separate victims. 259 Or App at 438 (Edmonds, S. J., dissenting). That argument, which depends in large part on speculation, is unavailing for several reasons.

First, it fails to acknowledge the fact that, in examining the legislative history of the criminal history rule, we have stated that the rule's purpose is to subject *repeat* offenders to a greater quantum of criminal consequences. For example, the dissent argues that defendant's conviction for striking one child should enhance defendant's criminal history score during sentencing for the crime against the other child, stating that the criminal history rule authorizes courts to assess an "offender's criminal history at the time that the offender is sentenced for the current crime." 259 Or App at 431 (Edmonds, S. J., dissenting). Yet, this court has rejected the argument that "the rule requires courts to consider *any* prior conviction to be part of an offender's criminal history." *Allen*, 151 Or App at 290 (emphasis in original). In *Allen*, we reasoned:

> "Merely because a conviction occurs at the time sentencing is pronounced in open court does not mean that it must become, at that moment, part of the offender's criminal history. The state's construction, in fact, cannot be reconciled with the language in the rule that defines 'criminal history' in terms of the record of convictions 'at the time the current crime *or crimes* of conviction are sentenced.' If, upon sentencing, each crime becomes part of the criminal history,

as the state suggests, then the reference in the rule to prior convictions at the time of the crimes of conviction becomes mere surplusage. We are instructed not to give a construction to enactments that renders portions of it meaningless, if possible."

151 Or App at 290-91 (quoting the criminal history rule) (emphasis added).

The dissent ignores as well the fact that the legislature has established other statutory mechanisms for ensuring that an offender who commits a crime involving multiple victims faces more severe penal repercussions than one who commits the same type of crime involving a single victim. Indeed, ORS 131.505(3), the statutory subsection immediately preceding to the subsection defining "same criminal episode," specifically mandates that, "[w]hen the same conduct or criminal episode, though violating only one statutory provision, results in * * * injury * * * of two or more victims, * * * there are as many offenses as there are victims." *See also* ORS 161.067(2) (cited by the dissent and containing substantially identical language as ORS 131.505(3)). Based on that statutory provision, defendant was charged with, and convicted of, two separately punishable offenses—one for each child that he criminally mistreated. But that does not control the distinct "same criminal episode" inquiry for criminal history score calculation purposes. In fact, the text of both ORS 131.505(3) and ORS 161.067(2) confirms that "the *same * * * criminal episode*" may involve harm to "two or more victims." (Emphasis added.)

And, most significantly, the dissent cannot overcome the legislative history of the definition of "criminal episode" in ORS 131.505(4). The commission commentary directly contradicts the dissent's proposed rule of law. For instance, the example and analysis of the car theft followed by a market robbery illustrate that, although a defendant commits different acts against different victims, such conduct does not necessarily suffice to establish multiple criminal episodes. In sum, there is no need, and thus no justification, for the dissent's foray into a general policy analysis.

Lastly, we reject the state's reliance on *State v. Hathaway,* 82 Or App 509, 728 P2d 908 (1986), *rev den*, 302

Or 594 (1987), *State v. Sparks*, 150 Or App 293, 946 P2d 314 (1997), and *State v. Knight*, 160 Or App 395, 981 P2d 819 (1999). As an initial matter, we note that none of those cases considers the issue before us in this opinion. Neither *Sparks* nor *Hathaway* deals with the criminal history rule at all. *Sparks* predates that rule and pertains to the application of the "200 percent" and "shift to column I" rules to consecutive sentences. 150 Or App at 296. *Hathaway* is a double jeopardy case. 82 Or App at 511-12. And, in *Knight*, we held only that the trial court erred by failing to include an offender's multiple prior convictions—which the court concluded were part of the same criminal episode—in its criminal history score calculation when sentencing on a conviction from an *undisputedly separate* criminal episode. 160 Or App at 399, 404-05.

According to the state, however, those cases nevertheless demonstrate that the relevant inquiry for determining a defendant's criminal history score in a case involving multiple crimes against multiple victims is whether the defendant made discrete decisions to commit each offense, despite an overarching criminal objective. We disagree. First, as we have noted, that view is not consonant with the text or intent of the criminal history rule and the definition of "criminal episode." Second, it is at loggerheads with the principle established by the Supreme Court in *Boyd* and *Cloutier*: separate acts are not *per se* equivalent to separate objectives. Rather, a criminal objective "refers to the pursuit of some object or attainment of some goal beyond the successful commission of the acts" at issue. *Cloutier*, 286 Or at 599 n 21. *Hathaway* and *Knight* are further distinguishable because our conclusion in those cases that there were multiple objectives was based first and foremost on the existence of a significantly longer gap in time between the multiple offenses at issue. *See Hathaway*, 82 Or App at 514-15 (two drug deals four hours apart are separate criminal "episodes"); *Knight*, 160 Or App at 404 (unlawful entries two hours apart are separate "offenses"). In contrast, this case involved a time differential of mere seconds. Although a court may conclude that, in several hours, a defendant had the time to, and did, formulate distinct criminal objectives,

we do not think that the gap in time in this case can lead to the same conclusion.

Given the deferential standard under which we review the trial court's factual findings, we will not disturb its conclusion that there was a gap in time and location, minimal though it was, between defendant's striking the first child and his striking the second child. However, as defendant argues, and as we noted above, the standard is not whether there is any difference in time and space at all, but whether there is enough of a difference in time, place, and circumstances surrounding the different acts to show that defendant's conduct was directed toward separate criminal objectives. Even under a deferential standard of review, we do not accept that such a *de minimis* interruption, with nothing else, offers a sufficient evidentiary basis on this record for the trial court's further factual finding that defendant "had two distinct objectives in * * * mistreating each of these children." We conclude that the trial court erred when it made that finding. Consequently, it erred in reasoning from that fact that the two spankings were not part of the same criminal episode. Because we conclude as a matter of law that the two spankings arose from conduct that was so joined in time, place, and circumstances that they shared a common objective and constituted a single criminal episode, we hold that the trial court erred in calculating defendant's criminal history score as a "D" for purposes of sentencing him on Count 2. Accordingly, we remand for resentencing.[8]

Remanded for resentencing; otherwise affirmed.

**EDMONDS, S. J.,** concurring in part, and dissenting in part.

I agree with the majority's analysis and conclusion that the "now or never" nature of defendant's challenge to his sentences makes this appeal justiciable. However, for the reasons discussed below, I disagree with the majority's

---

[8] Because we hold in favor of defendant on the basis of the statutory test for "criminal episode" in ORS 131.505(4), we do not reach defendant's second argument, regarding whether the parallel "cross-relation" test for "criminal episode" is satisfied. *See Witherspoon,* 250 Or App at 322-23 (clarifying that crimes will be deemed as having arisen from the same criminal episode upon satisfying either of the two tests); *see also Potter,* 236 Or App at 84-85.

analysis and conclusion that defendant's convictions under Counts 1 and 2 constitute part of a single criminal episode. I would hold that the trial court did not err in imposing sentences that used the conviction on Count 1 as criminal history for purposes of sentencing on Count 2 because the criminal mistreatment of S constituted a separate criminal episode from the criminal episode in which K was criminally mistreated.

Count 1 alleges that defendant committed the crime of criminal mistreatment by knowingly causing physical injury to K. Count 2 alleges that defendant committed the crime of criminal mistreatment by knowingly causing physical injury to S. The evidence at trial demonstrated that S, K, and a sibling were in the same room together. After spanking the sibling, defendant spanked and inflicted physical injury on S by spanking him more than five times. He then turned his attention to K and inflicted physical injury on him by spanking him 15 to 25 times. K and S suffered substantial bruising as a result of defendant's separate actions directed at them individually.

OAR 213-004-0006(2) provides that an offender's criminal history is based on the number of adult felony convictions, Class A misdemeanor convictions, and juvenile adjudications in the offender's criminal history at the time that the offender is sentenced for the current crime. The rule focuses on the criminal history that exists at the time of sentencing on the conviction and not on the time that the crime was committed. Accordingly, the fact that S was mistreated before K was mistreated plays no role in the calculation of defendant's criminal history for the sentencing of the crime committed against S because defendant was sentenced for the mistreatment of K before the trial court undertook to sentence defendant for the crime committed against S.

"Thus, if a defendant is convicted of two crimes in one proceeding, and a court pronounces sentence on the first conviction seconds before calculating the sentence on the second, then the first conviction may be used to calculate the defendant's criminal history on the second conviction. There is one caveat: Only convictions that arose out of

separate criminal episodes count as part of the defendant's criminal history for sentencing purposes."

*State v. Yashin*, 199 Or App 511, 514, 112 P3d 331, *rev den*, 339 Or 407 (2005) (internal quotation marks omitted).

For purposes of computing a defendant's criminal history,

"[t]he legal determination that convictions arose out of separate criminal episodes is based on a factual finding[;] specifically, the finding that the acts giving rise to the convictions were not part of continuous and uninterrupted conduct that * * * is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a criminal objective."

*Id.* (internal quotation marks omitted). Thus, the proper focus is not on whether there was a single act that violated a criminal law, but on whether there is a "singleness" of a criminal objective that is accomplished by the commission of the underlying criminal acts. *State v. Cloutier*, 286 Or 579, 596-99, 596 P2d 1278 (1979). My disagreement with the majority begins with its misidentification of defendant's "criminal" objective.

Defendant summarizes his argument as follows:

"In this case, defendant spanked two of his children in quick succession, in the same room and on the same piece of furniture, for their shared misconduct. The two acts of spanking are part of the same criminal episode because they accomplished the same criminal objective and occurred during defendant's continuous and uninterrupted course of punishing his children."

Subsequently, defendant explains in his brief that "defendant developed the objective to punish all his children before committing either assault, when he discovered them in the bathroom with a water mess."

At the core of my disagreement with the majority is its acceptance of defendant's argument that defendant's "criminal" objective was to punish his children for the mess they made in the bathroom. The majority notes:

"Defendant asserts that there was one single criminal objective—to strike his children for the mess that he believed they jointly made."

259 Or App at 423.

An objective to discipline one's children by spanking them does not constitute a "criminal" objective within the meaning of sentencing law. An objective becomes "criminal" in nature only when a person purposes to violate a criminal law or to engage in conduct that the law makes criminal. Defendant's objective to spank all of his children to discipline them for the mess they made in the bathroom does not constitute a "criminal objective" because that objective is not "criminal" in nature. Moreover, under the majority's premise, every parent who undertakes to discipline a child by spanking the child forms a criminal objective. But there is simply no law on the books in the State of Oregon that makes a person guilty of criminal conduct for the punishment of a child absent the infliction of physical injury or some other circumstance outlawed by statute. In this case, had defendant spanked his children without causing any of them physical injury, he could not have been said to have formed a criminal objective under the law. Thus, defendant's "criminal" objective or objectives in this case was to mistreat his children by spanking them to the extent that his actions caused physical injury to them as the indictment alleges.

Properly identifying defendant's "criminal" objectives constitutes the cornerstone for determining whether, under Oregon sentencing law, defendant had more than one criminal objective, *i.e.*, whether the legislature would have intended that the sentence imposed for the mistreatment of S could be enhanced because of the prior mistreatment of K. The critical facts of this case for determining whether defendant had multiple criminal objectives are that the two victims were injured separately as a result of defendant spanking each of them individually and one after the other. In the abstract, the existence of two victims separately injured by separate actions suggests that defendant must have had more than one criminal objective in order to injure two persons by separate actions.

In its quest for guidance for legislative intent regarding this issue, the majority relies on *State v. Kautz*, 179 Or App 458, 39 P3d 937, *rev den*, 334 Or 327 (2002) and *State v. Witherspoon*, 250 Or App 316, 280 P3d 1004 (2012). That reliance is misplaced because neither case involved multiple victims. The victim in *Kautz* was a homeowner who was victimized when the defendant entered a workshop and stole personal property from the owner of the workshop. When confronted by the victim, the defendant used a gun to steal the victim's car. In *Witherspoon*, the victim was the defendant's wife. As a result of a domestic dispute with her, the defendant was convicted of misdemeanor assault, menacing, and felony assault. We held that he had an overarching objective to harass and injure the victim throughout the continuing physical and emotional abuse he inflicted on her. In contrast to *Kautz* and *Witherspoon*, this is a case where there are two victims each injured by discrete acts that were directed particularly at each victim.

The parties cite three cases in their briefs that deal with the circumstance of multiple victims. Defendant relies on *State v. Norman*, 216 Or App 475, 174 P3d 598 (2007), *vac'd*, 345 Or 319 (2008), and *State v. Bryant*, 245 Or App 519, 263 P3d 368 (2011), arguing that they "directly control this case." In *Norman*, the defendant drove his vehicle toward two officers causing them to move to avoid being hit. He then drove at a third officer and a fourth officer. We concluded that it would have been functionally impossible for the defendant to have presented his defense as to one of the assaults—that his actions were the result of a panicked response to avoid the other officers' gunshots— without relating the details of those encounters with the other officers. We concluded therefore that the trial court erred in ruling that that episode arose from the same criminal episode as other crimes because a complete account of one offense could not be related without referring to the details of the others. 216 Or App at 489-90.

In *Bryant*, the defendant assaulted a corrections officer. When another corrections officer attempted to intervene, the defendant also assaulted him. We held, "[i]t is apparent from our recitation of the facts in this case that defendant's

assault of Frye was so interrelated with his assault of Lake that a complete account of defendant's conduct against Frye cannot be related without also relating details of defendant's conduct directed at Lake." 245 Or App at 523. Neither *Bryant* nor *Norman* is helpful to the resolution of this case because the criminal mistreatment charge pertaining to S could be prosecuted and defended without reference to the criminal mistreatment of K, and *vice versa.*

The multiple-victim case on which the state relies is *State v. Kessler,* 297 Or 460, 686 P2d 345 (1984), a case in which the court explained its holding in *State v. Linthwaite,* 295 Or 162, 665 P2d 863 (1983). In *Linthwaite,* the defendant had brandished a knife threateningly at three family members and a bystander. As a consequence, he was convicted of four counts of attempting to use a dangerous weapon, all arising out of the single act of brandishing the knife at the victims. The Supreme Court held that "ORS 131.505(3), which, for former jeopardy purposes, creates a separate offense for each victim of a criminal episode, does not indicate legislative intent that punishment be by way of multiple sentencing." 295 Or at 179. *Linthwaite* is an example of multiple victims injured by the same criminal conduct and how the legislature would have viewed that conduct for purposes of sentencing. This case differs from the facts in *Linthwaite* because defendant separately mistreated each victim, one after the other.

The circumstances in *Kessler* involved separate victims who were subjected to separate restraints of their liberty by the defendant and his co-actors during their escape from jail. In the course of the escape, multiple victims were forced at gunpoint to give up their clothing and were then locked in a cell, one by one. The issue on review by the Supreme Court was whether multiple sentences were precluded and whether the court was required to merge the second-degree kidnapping convictions into one sentence and merge the two first-degree kidnapping convictions into one sentence.

In *Kessler,* the Supreme Court held that "[n]othing in *Linthwaite* stated that there cannot be multiple sentences

for offenses against several victims in the absence of 'express legislative intent' to that effect." 297 Or at 465. Rather,

> "[t]he major element in assessing whether multiple statutory violations were meant to carry cumulative punishment is whether they were committed in the course of a single criminal episode joined in time, place and circumstances and directed toward a single criminal objective. *See State v. Cloutier,* [286 Or 579, 595, 596 P2d 1278 (1978)] (drawing on ORS 131.515 (2)). There, the court noted that the test of a single criminal objective is no panacea. People have goals for the long, medium, or short term, and the objective of the immediate act often is pursued as a step toward a more distant goal. One may have fully achieved the immediate goal of the particular offense committed toward a victim although one has not gained one's wider objective. 286 Or at 583. *Cloutier* also drew attention to the problem of multiple victims, pointing out reasons why an overly simple formula would not reflect the dissimilarities between situations that intentionally or unexpectedly involve more than one victim. The presence and sometimes the identity of the victim may be integral to the criminal objective, or it may be an incidental and undesired circumstance. 286 Or at 598-599."

*Kessler,* 297 Or at 465-66 (footnotes omitted).

Even though the defendant's overarching criminal objective during his course of conduct directed at the victims was solely to facilitate his escape, the *Kessler* court utilized a test that inquired whether each of the kidnappings of multiple victims constituted a purposeful and deliberate act pursuant to the defendant's criminal objective to escape, *i.e.,* whether the presence of multiple victims was integral to his criminal objective or whether the presence of multiple victims was merely incidental as an unexpected or happenstance to his objective to escape. *Id.* at 466. The court noted that each kidnapping achieved a discrete intermediate objective and therefore constituted a separate criminal objective for sentencing purposes. The court explained:

> "In this sequence of events, the fact that the criminal conduct involved multiple victims was no casual coincidence. Each of the civilian victims was summoned for a purpose, to obtain his clothing for one of the prisoners. Each was

locked up in order to prevent interference with the escape. This kidnapping episode achieved its intermediate object in the larger scheme toward the ultimate objective of escape. Thereafter, first one and then the other corrections officer was taken hostage."

297 Or at 467.

This court in *Kessler* had held that separate sentences could not be imposed unless it could be shown that the legislature intended separate sentences and, accordingly, that the four second-degree kidnapping convictions should have been merged into one sentence and the two first-degree kidnapping convictions should have been merged into one sentence. However, the Supreme Court reversed this court, leaving our decision without precedential value, and remanded the case to the circuit court for reinstatement of the circuit court judgment imposing four 10-year maximum sentences for the second-degree kidnapping of the civilian victims and two sentences for the first-degree kidnapping of the corrections officers, all to be served consecutively. 297 Or at 469. In arriving at its conclusion, the court observed:

> "The disposition of offenders is as much a matter of legislative policy, within constitutional limits, as the definition of offenses. *State v. Cloutier, supra* 286 Or at 583-587. In the absence of explicit legislation or legislative history on this subject, the court therefore has sought to discern the apparent or most probable legislative policy toward cumulative or consecutive sentences."

297 Or at 464 (footnote omitted).

That statement defines our task in this case. As noted above, this case presents at its core a question of legislative policy. There is no statute or legislative history that directly controls the issue.[1] *Kautz* and *Witherspoon* are not

---

[1] According to the majority, "[t]o agree with the state and the dissent would contravene the legislative history of ORS 131.505(4)." 259 Or App at 425. Respectfully, that assertion proves too much for two reasons. First, ORS 131.505(4) provides a definition for the former jeopardy provisions of ORS 131.505 to 131.525. The legislative history relied on by the majority underlying ORS 131.505(4) is contained within the 1972 commentary to the proposed revisions of the Oregon Criminal Procedure Code. The sentencing guidelines were adopted by the legislature in 1989. If, in fact, the 1973 legislature intended that the examples in the proposed 1972 criminal code would govern the provisions of the sentencing guidelines in 1989, it was remarkably prescient. Second, there is

controlling, because they do not involve multiple victims. *Kessler* also does not control this issue, because it did not involve a determination about whether there was a single criminal episode for purposes of sentence enhancement under the sentencing guidelines. Rather, *Kessler* decided whether sentences for injuries to multiple victims should merge or run consecutively. Thus, the *holding* in *Kessler* is of no import to us. That acknowledged, I believe that the reasoning in *Kessler* constitutes a reflection of how courts and the legislature have viewed enhanced sentencing issues where there are multiple victims injured by the separate actions of a defendant. The test created by the *Kessler* court is a valid methodology for assessing when it is and is not proper to hold an actor accountable for injuries to multiple victims. Indeed, the principles in *Kessler* regarding multiple victims injured by separate acts have found their way into statutes that express the legislature's policy.[2]

In light of the fact that there is no controlling statute, legislative history, or case law directly on point, I propose the following rule based on my reading of *Kessler* and *Linthwaite* and their implicit understanding of legislative policy: Where multiple victims are injured by the same actor, the actor's criminal objective or objectives will depend on the circumstances of the injuries. If the actor injures multiple victims by a unitary action, *e.g.*, brandishing a knife at them or shooting a gun at a crowd, the fact that the actor injures more than one person does not operate to multiply the actor's unitary criminal objective. The injuries to multiple victims are happenstance or incidental to the criminal objective, and in such a circumstance, there is no intermediate objective. If, instead, the actor directs separate actions at separate victims thereby injuring each of them, the actor

---

nothing in the commentary that is inconsistent with my position. Crimes committed against multiple victims may be the result of single or multiple criminal objectives as my construct acknowledges. It all depends on the circumstances once the "criminal" objective or objectives are properly identified.

[2] For example, ORS 161.067 governs the determination of when there are separately punishable offenses for the same conduct or criminal episode involving multiple victims. Even though the same conduct violates only one statutory provision, there are as many separately punishable offenses as there are victims under the provisions of that statute. Also, ORS 137.123(5) provides that consecutive sentences may be imposed when injury is caused to more than one victim.

is said to have more than one criminal objective because the presence or identity of each victim is integral to the actor's criminal objectives rather than incidental. It matters not to the analysis that the actor may have had an overarching criminal objective. The intermediate objectives to injure each victim operate to facilitate the actor's overarching objective and, therefore, for sentencing enhancement purposes, the actor should be held accountable for the multiple criminal objectives.

Assuming that defendant's criminal objective in this case was to cause both S and K physical injury in order to punish them for the mess in the bathroom, defendant could not have accomplished his criminal objective to physically injure K unless K had been present. Under the proposed test, K's identity and presence was integral to his criminal mistreatment and could not be properly characterized as incidental or happenstance. It follows that defendant's criminal objective to physically injure K was separate from his criminal objective to physically injure S and that defendant had as many criminal objectives as he had victims.

The majority's second criticism of my application of the *Kessler* construct to the facts of this case is that it "depends in large part on speculation." 259 Or App 427. Respectfully, any time a court undertakes to discern legislative intent in the absence of direct legislative direction or legislative history, the undertaking is inherently speculative; but that is the task that the constitution has assigned to us. Contrary to the majority's assertion, the reality is that there exists no statute, rule, legislative history, or case law precedent that is, either factually or legally, directly on point to the factual circumstances in this case. We are therefore left to figure out what result the legislature and its delegate, the State Sentencing Guidelines Board, would have intended had it considered the precise issue before us.

The majority's conclusion that there was only one criminal objective because defendant had an overarching motive to punish all of his children for the mess in the bathroom is flawed for the reasons described above. Assuming defendant had an overarching objective to punish his

children by physically injuring them, he undertook to accomplish his objective by a series of separate intermediate actions directed at separate victims. In my view, the legislature would have viewed those actions as prompted by more than one criminal objective for purposes of sentencing enhancement in light of the purposes of sentences. In terms of just desserts for criminal conduct, the legislature has always embraced a policy of accountability that takes into account additional criminal behavior of the defendant. That policy goal is not satisfied by the majority's analysis in this case; under its analysis, it matters not for sentencing enhancement purposes how many children defendant separately injured.

For these reasons, I dissent.