Argued and submitted September 27, 2001, convictions affirmed; remanded for
resentencing February 13, 2002

## STATE OF OREGON,
*Respondent,*

*v.*

## DENNIS CHARLES KAUTZ,
*Appellant.*

D9708187M, D9708211M, D9708439M, C973596CR,
C973597CR, C980503CR, C980504CR, C980338CR;
A102986 (Control), A102987, A102988, A103386,
A103387, A103388, A103389, A103822
(Cases Consolidated)

39 P3d 937

Jennelle Hall, Deputy Public Defender, argued the cause for appellant. With her on the opening brief was David Groom, Public Defender. Dennis Charles Kautz filed the supplemental briefs *pro se*.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Armstrong, Judge.

EDMONDS, P. J.

---

* Deits, C. J., *vice* Warren, S. J.

## EDMONDS, P. J.

In this criminal case, defendant appeals from a conviction for burglary in the first degree, ORS 164.215 (the Osman burglary), arguing that his conduct constituted only second-degree burglary. He also assigns error to the court's refusal to follow the "shift to column I" rule when it imposed consecutive sentences for a second burglary conviction and robbery conviction (the Whitehead burglary). OAR 213-012-0020. We affirm defendant's convictions[1] and remand for resentencing.

The facts in this case arise from a crime spree that occurred during a weekend in December 1997. As a result, defendant was charged with committing multiple crimes, including burglaries and thefts from vehicles, garages and yards in a certain neighborhood. As pertinent to this appeal,[2] defendant entered a workshop that belonged to the Whitehead family, and that was located near their home. He rummaged through the contents of the shop, took some personal property, including a shotgun, from the workshop, put the items inside a car located in the workshop, and then drove the car out of the workshop into a hedge. Whitehead saw defendant taking the car. He grabbed a gun and pointed it at the car and defendant, demanding that defendant stop. In response, defendant immediately pointed the shotgun that he had just stolen at Whitehead, and told him to "back off." Defendant then got out of the car, ran through the hedge, and disappeared into a nearby field.

Many of Whitehead's neighbors were aware of the criminal acts that had occurred earlier in the weekend and at the Whitehead residence. After the police failed to find defendant in the vicinity of the Whitehead residence, Osman, a neighbor of the Whiteheads, decided to check on a nearby house that he owned. Osman and his family had lived in the

---

[1] Defendant assigns error both to the denial of a mistrial, which would affect all of his convictions, and to his conviction on count nine of the indictment, but we reject those assignments of error without discussion.

[2] Although defendant appeals from eight judgments of conviction and the sentences imposed therein, the assignments of error that we discuss pertain only to the convictions arising from the Whitehead and Osman incidents.

house for many years but had moved out of the house six months before the crime spree. The house was listed for sale but was vacant at the time. However, Osman kept some tools and personal belongings in the house and worked there at least one day a week. The utilities were connected, and the house contained draperies, some tools, boots and other personal items that belonged to Osman and members of his family.

When Osman approached the house, he noticed items in the house that were not his. He immediately left and contacted the police. When officers arrived, they found defendant in the house, along with items stolen from various other property owners who lived nearby. Defendant was arrested and prosecuted under a 34-count indictment that included charges of burglary and robbery based on the incident with Whitehead and the burglary of the Osman house.

At trial, defendant moved for a judgment of acquittal on the Osman burglary charge. He argued that the evidence was insufficient to show that Osman's house was a dwelling within the meaning of ORS 164.205(2), because the house had been vacant for six months before his entry and because his entry was unlikely to terrorize any occupant of the house.

The trial court held that the house was a dwelling. It ruled:

> "What we have is a house that had been used as a dwelling for a significant period of time, in an area of dwellings, and that was being painted and fixed up for purposes of selling it to another owner. I think that it's very similar to [*State v. Ramey*, 89 Or App 535, 749 P2d 1219, *rev den* 305 Or 577 (1988)], and so I'm going to deny the motion[.]"

ORS 164.215 provides that "a person commits the crime of burglary in the second degree if the person enters or remains unlawfully in a *building* with intent to commit a crime therein." (Emphasis added.) ORS 164.225 provides that "[a] person commits the crime of burglary in the first degree if the person violates ORS 164.215 and the building is a dwelling[.]" ORS 164.205(1) defines "building" as "in addition to its ordinary meaning, * * * any booth, vehicle, boat,

aircraft or other structure adapted for overnight accommodation of persons or for carrying on business therein." ORS 164.205(2) defines "dwelling" as "a building which *regularly or intermittently is occupied by a person lodging therein at night,* whether or not a person is actually present." (Emphasis added.) Thus, a "building" becomes a "dwelling" for purposes of first-degree burglary if it is "regularly or intermittently occupied by a person lodging therein at night."

■   The ordinary meaning of the word "intermittent" as used in the context of ORS 164.205(2) is that a building is "intermittently" occupied by a person lodging therein at night if it is occupied at night "at intervals" or with overnight occupancy that "comes and goes" or "ceases at intervals." *Webster's Third New Int'l Dictionary,* 1180 (unabridged ed 1993). The legislative commentary provides further definition. It states that the burglary statutes define "building" and "dwelling"

> "to include those structures and vehicles which typically contain human beings for extended periods of time, in accordance with the original and basic rationale of the crime: protection against invasion of premises likely to terrorize occupants." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report (July 1970), § 135.

We have applied that standard to a variety of situations that further inform the statutory distinction between a "building" and a "dwelling." In *State v. Eaton,* 43 Or App 469, 471-72, 602 P2d 1150 (1979), *rev den* 288 Or 335 (1980), we held that a dormitory for students, occupied for eight weeks each year and burglarized six months after the last occupant left for the year, was not a dwelling. We said, "where an eight week period of occupancy is followed by 44 weeks of vacancy, and where the burglary occurred months after the last occupant left, we conclude that the structure is not used 'regularly or intermittently.' " *Id.* at 472.

Conversely, we held in *State v. McDonald,* 77 Or App 267, 272-73, 712 P2d 163 (1986), that a 32-foot trailer, parked in the driveway of a residence, was a dwelling because it was used as an overnight accommodation several times a year. On the date of the burglary in *McDonald,* the trailer was to

have been occupied overnight by a guest of the owner. We held that the statute's requirement of "intermittent" overnight occupancy was satisfied by evidence that "the owner's guests and relatives came to and went from the trailer at intervals." *Id.* at 272-73.

Finally, in *State v. Ramey*, 89 Or App 535, 539, 749 P2d 1219, *rev den* 305 Or 577 (1988), we held that a vacant apartment that was undergoing remodeling was a dwelling. We noted that it had been occupied continuously for the past few years, that it had been vacant for only two months, and that it would be occupied again as soon as the remodeling was complete. At the time of the entry, the bedroom was not completed and was unfurnished. The next renter had been identified but had not moved in. We explained:

> "Here, the apartment had been used by the previous owner for several years as a residence. The present owner had previously rented the apartment to a tenant as a residence for a four-month period and planned to relet it for that purpose in the near future. * * * Under the circumstances, defendant's entry was likely to terrorize an occupant." *Ramey*, 89 Or App at 539.

We turn to the facts of this case. The Osman house is a two-story, four bedroom house with an attached garage on seven acres of land. The house had been occupied regularly for years but had been vacant and unfurnished for six months before defendant's entry. It was to be sold as a residence and was ready for occupancy. Osman testified that "it was a habit of mine to be in there on a regular basis, cleaning it, fixing it, whatever. So, typically, once a week I would be in there." Thus, defendant entered into the Osman house during a short period of vacancy that followed a long period of overnight occupancy. The fortuity that defendant burglarized the home during an interval when occupancy had ceased does not change the nature of his crime. As ORS 164.205(2) makes clear, a building is a dwelling if it is intermittently occupied at night, "whether or not a person is actually present."

The facts of this case are more like the facts in *McDonald* and *Ramey* than they are like the facts in *Eaton*. In *Eaton*, the occupancy was not "intermittent" because the building was vacant for 44 weeks of every year and had been

vacant for months after the last occupant left. Hence, overnight occupancy did not "come and go" so as to create a likelihood of terrorizing occupants. In contrast, the trailer in *McDonald* was occupied on an overnight basis several times a year when guests came and went. Similarly, the apartment in *Ramey* was occupied at intervals depending on its state of repair. Here, the house had been occupied for years and would be occupied again as soon as it was sold. On those facts, we conclude that the cessation of overnight occupancy was intermittent and that the trial court correctly denied defendant's motion for a judgment of acquittal.

In defendant's second assignment of error, he contends that the court erred when it declined to follow the "shift to column I" rule (OAR 213-012-0020) regarding the sentence for the burglary of the Whitehead's workshop. OAR 213-012-0020 provides, in part:

> "(a)   Subject to the provisions of subsection (b) of this section, the presumptive incarceration term of the consecutive sentences is the sum of:

> "(A)   the presumptive incarceration term or the prison term defined in OAR 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(1) imposed pursuant to a dispositional departure for the primary offense, as defined in OAR 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(17); and

> "(B)   up to the maximum incarceration term indicated in the Criminal History Column I for each additional offense imposed consecutively."

The trial court, in sentencing defendant, grouped the charge of robbery with the charge of unlawful use of a firearm and held that, while those two crimes were part of the same uninterrupted criminal conduct, they were, together, "a totally separate criminal act [from the burglary] after there was interruption in the criminal behavior." The trial court therefore imposed consecutive sentences of 90 months for the robbery and 16 months for the burglary.

■■   On appeal, defendant argues:

> "The sentencing guidelines require a sentencing court to shift the criminal history score to column I when imposing consecutive sentences for convictions arising out of the same criminal episode. * * * However, OAR 213-012-0002

does not apply to sentences imposed for crimes stemming from separate criminal episodes. * * * The robbery charge in this case could not be tried without introducing evidence of the burglary charge. The two crimes stemmed from the same criminal episode. Both crimes furthered the criminal objective of taking Whitehead's property from Whitehead, and so involved only one victim. In imposing a consecutive sentence on the burglary conviction, the trial court should have used criminal history column I."

The state responds:

"Defendant's shift-to-column-I argument is mistaken. The rule that contains this provision, OAR 213-012-0020, only applies to consecutive sentences imposed for crimes committed as part of the same criminal episode. The trial court found these crimes involved different criminal episodes; this finding is supported by the record and was correct."

It adds:

"The burglary and the robbery were not directed toward the same objective. Defendant's burglary was directed toward stealing the Whitehead's property. He accomplished that objective. As he was making his getaway, the victim interrupted his escape. The robbery was directed at different objectives: defendant's desire to get away with the property he had just stolen and his desire to put the victim in fear for his life to facilitate his escape."

By its own terms, the shift to column I rule applies only to crimes that are sentenced consecutively. The predicate to imposing consecutive sentences under ORS 137.123(2) is a finding that the crimes were not part of the same criminal episode.[3] *See State v. Miller*, 317 Or 297, 306, 855 P2d 1093 (1993). Thus, the parties agree that the assignment of error should be resolved by a determination of whether the burglary and robbery were part of the same criminal episode. If the crimes were a single criminal episode, the trial court should have shifted its focus to column I of the sentencing guidelines grid in determining the presumptive sentence on the burglary conviction. We turn to the question

---

[3] If crimes are a part of the same criminal episode, the court must make specific findings under ORS 137.123(4) if it wishes to impose consecutive sentences.

of whether the burglary and robbery were a single criminal episode.

■ The term "criminal episode" is defined in ORS 131.505(4):

> " 'Criminal episode' means continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective."

We explained in *State v. Sparks*, 150 Or App 293, 297, 946 P2d 314 (1997), that a criminal episode, as defined in ORS 131.505(4),

> "is synonymous with the phrase, 'same act or transaction.' *State v. Boyd*, 271 Or 558, 565-66, 533 P2d 795 (1975); *State v. Fitzgerald*, 267 Or 266, 273, 516 P2d 1280 (1973). In *Fitzgerald*, the court said, regarding the latter phrase[, 'same act or transaction']:
>
> > " 'We hold that the two charges arise out of the same act or transaction *if they are so closely linked in time, place and circumstances that a complete account of the charge cannot be related without relating details of the other charge.*' " *Sparks*, 150 Or App at 297 (emphasis added).

Applying ORS 131.505(4) to the facts of this case, we agree with defendant that the burglary and robbery are so joined in time, place and circumstance that a complete account of each charge cannot be related without also relating the details of the other charge. First, all of the acts were committed within a few minutes in the driveway and the shop area of the Whitehead property. The conduct involved the same victim. The robbery occurred in the course of Whitehead's discovery that defendant had unlawfully entered his garage and stolen his car and the gun that defendant used to threaten Whitehead. The state acknowledged as much in its closing argument, when it told the jury that defendant "completed [the burglary] by stealing the car."

On appeal, the state argues that the burglary and the robbery were not directed toward the same criminal objective. According to the state, the objective of the burglary was to steal Whitehead's property, and the objective of the

robbery was to threaten Whitehead so he could escape with the property he had just stolen. We think that that kind of parsing of defendant's criminal objective is inconsistent with the intent of ORS 131.505(4). Under the facts of this case, the criminal objective of the burglary was to steal Whitehead's gun, personal property and car. The criminal objective of the robbery was, in the language of ORS 164.395, to "prevent or overcome resistance to the taking of" the personal property and the car immediately after the taking. ORS 131.505(4) is aimed at "continuous and uninterrupted conduct" that is directed to a single criminal objective. While defendant may have acquired an additional criminal objective to escape when confronted by Whitehead, his earlier objective to steal Whitehead's property continued during the course of all of the events.[4] Because the facts underlying the robbery and burglary were so closely joined in time, place and circumstances as to show that defendant continued to pursue the same criminal objective to deprive Whitehead of his property, we conclude that the trial court erred in concluding that the burglary and the robbery were separate criminal episodes. We affirm defendant's convictions but remand the case for resentencing pursuant to ORS 138.222(5).

Convictions affirmed; remanded for resentencing.

---

[4] From Whitehead's testimony, one could also infer that defendant had already formed the criminal objective of using force if necessary to facilitate his escape with the stolen goods. Whitehead testified:

"I stood up here, and I said, 'Stay in the car or I'll shoot.' And then almost instantly, a gun barrel comes out of the car, out the car window, pointed at me, and he said, 'Back off.'"