## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JAMES CHARLES TOOLEY,
aka James Tooley,
*Defendant-Appellant.*

Multnomah County Circuit Court
090331069; A148118

333 P3d 348

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Janet A. Klapstein, Senior Assistant Attorney General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

Defendant appeals from a judgment of conviction for two counts of aggravated murder, ORS 163.095(1)(d), and one count of solicitation to commit aggravated murder, ORS 161.435. In his first three of eight assignments of error, defendant challenges his aggravated murder convictions because the trial court's conclusion that he committed two murders "in the same criminal episode" was in error. Defendant also contends that, in light of OEC 401 and OEC 403, the trial court erroneously allowed a prosecution witness to use a gun similar to the murder weapon as demonstrative evidence. Defendant further argues that the trial court committed evidentiary error when it refused to admit, under the "rule of completeness" in OEC 106, certain statements made by defendant during police questioning. For the reasons discussed below, we affirm on those five assignments. Defendant's three remaining assignments of error—regarding the validity of a "death-qualified" jury and non-unanimous juries—we reject without discussion.

## I. "SAME CRIMINAL EPISODE"

We state the relevant background for each section separately, starting with the "same criminal episode" issue. We begin by introducing the framework of the parties' dispute regarding that issue, then describe the pertinent facts before proceeding to our analysis.

Pursuant to ORS 163.095(1)(d), the murder of more than one victim "in the same criminal episode as defined in ORS 131.505" constitutes aggravated murder. In turn, ORS 131.505(4) provides that, "'[c]riminal episode' means continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective." At the close of trial, defendant argued that the evidence was insufficient to prove that the two murders at issue occurred in the same criminal episode and, on that basis, moved for judgments of acquittal on both aggravated murder counts. The trial court denied the motions, concluding that there was sufficient evidence for the jury to decide that the murders were part of the same

criminal episode. Defendant later filed a motion for a new trial pursuant to ORCP 64 B(5) on the same ground. The trial court denied that motion as well.

Defendant's first three assignments of error challenge the trial court's denial of those motions. As explained further below, we conclude that the trial court properly denied defendant's motion for a new trial and correctly concluded that there was sufficient evidence to support the denial of defendant's motion for judgment of acquittal (MJOA).

## A. *Motion for New Trial*

At the outset, we dispose of defendant's challenge to the trial court's denial of his motion for a new trial. That assignment of error is not reviewable. Defendant filed his motion pursuant to ORCP 64 B(5), which provides in pertinent part that a court may grant a new trial for "[i]nsufficiency of the evidence to justify the verdict or other decision * * *." As we previously noted in *State v. Alvarez-Vega*, 240 Or App 616, 619, 251 P3d 199, *rev den*, 350 Or 297 (2011):

> "ORCP 64 B provides in pertinent part that a court may grant a new trial for, among other things, jury misconduct, ORCP 64 B(2), newly discovered evidence, ORCP 64 B(4), or an '[e]rror in law occurring at the trial and objected to or excepted to by the party making the application,' ORCP 64 B(6). In *State v. Sullens*, 314 Or 436, 839 P2d 708 (1992), the court examined the history of those provisions * * *. Ultimately, the court concluded that the denial of a motion for a new trial in a criminal case was reviewable on appeal only if the motion was based on alleged juror misconduct or newly discovered evidence. *Id.* at 442-43; *see also State v. Grey*, 175 Or App 235, 245, 28 P3d 1195 (2001), *rev den*, 333 Or 463 (2002) (court could not review denial of motion for a new trial raised under ORCP 64 B(6) because it was not based on newly discovered evidence or jury misconduct); *State v. Mayer*, 146 Or App 86, 932 P2d 570 (1997) (same)."

(Brackets in original.) Defendant's motion for a new trial was not based on jury misconduct or newly discovered evidence, as required for reviewability. We therefore will not review defendant's assignment of error regarding his motion for a new trial.

B. *Motion for Judgment of Acquittal*

We review a denial of an MJOA to determine whether, viewing the facts in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). In the context of this appeal, that means that we will affirm the trial court's denial of defendant's MJOA unless a rational trier of fact viewing the evidence in the light most favorable to the state could not have found, beyond a reasonable doubt, that the murders were part of a course of "continuous and uninterrupted conduct that establishe[d] at least one offense and [was] so joined in time, place and circumstances that such conduct [was] directed to the accomplishment of a single criminal objective." ORS 131.505(4); *see also State v. Yashin*, 199 Or App 511, 514, 112 P3d 331, *rev den*, 339 Or 407 (2005) (holding, in a related context, that "[t]he legal determination that convictions arose out of separate criminal episodes is based on a factual finding[;] specifically, the finding that the acts giving rise to the convictions were not part of continuous and uninterrupted conduct that *** is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a criminal objective" (internal quotation marks omitted; omission in original)). With that in mind, we turn to the facts.

Defendant sold illegal narcotics along with and on behalf of one of the murder victims, Anthony Cooper. Cooper was married to and lived with Melinda Kotkins, the other victim, who also participated in Cooper's narcotics business.

On June 2, 2008, Cooper, who had a prior felony conviction and, therefore, could not purchase a gun himself, enlisted a friend, O'Day, to buy him a gun. Defendant accompanied O'Day to purchase the gun, pointing out the precise make and model that Cooper desired, a .38 caliber Smith & Wesson Model 637 revolver equipped with a laser site. Defendant was with O'Day when O'Day delivered the gun to the victims. At the end of June 2008, another witness, Bastrica, observed defendant showing Kotkins how to use a small .38 caliber revolver with a laser sight on it.

Bastrica later testified that he thought that the pistol was kept in the townhouse that Cooper and Kotkins shared.

Later in June, Cooper was booked into the Multnomah County Detention Center. Defendant sold drugs for Cooper while Cooper was incarcerated. Cooper was released 30 days later, on the morning of July 24, 2008.

That same day, the victims were last seen alive by defendant, according to defendant's own statements. Defendant reported visiting Kotkins at her home at about 2:00 a.m. that morning to deliver drug proceeds to her. Defendant said that he left the home at about 2:30 a.m. Surveillance video from a convenience store three blocks away from the townhouse shows defendant entering the store and making a purchase at about 2:55 a.m. on July 24.

Later that morning, defendant was waiting to pick Cooper up when Cooper was released from jail at 9:15 a.m. Accompanied by defendant, Cooper went to Kotkins's father's hair salon and got a haircut sometime before lunch, then visited Cooper's mother's office. Shortly after noon, the pair stopped by a gas station, where Cooper bought some orange juice and cigarettes. Throughout the day, Cooper tried unsuccessfully to reach Kotkins by phone. Around 1:20 p.m., defendant took Cooper to the hair salon where Kotkins worked so that Cooper could look for his wife there. According to defendant, he then dropped Cooper off at the townhouse, just a few blocks away from the hair salon.

The last outgoing call from Kotkins's number was placed at 9:53 p.m. the night of July 23, 2008. There were two calls from defendant's phone to Kotkins's on July 24—one at about 2:15 a.m. and another at around 8:00 a.m. Although defendant had placed close to 300 calls to Kotkins during the previous month, he did not call her after 8:00 a.m. on July 24. All incoming calls made to Kotkins's phone number after 9:00 a.m. that day went to her voicemail.

Later in the day on July 24, defendant drove with a friend to the Oregon coast to join his family on a camping trip. On the way, he stopped at a department store in the city of Cornelius, where, at approximately 5:00 p.m., he purchased men's clothing, a tote bag, backpack, and duffle bag.

On July 28, defendant returned to the victims' home, where a hidden camera—installed, coincidentally, that day by Gresham police investigating Cooper's possible involvement in selling narcotics—recorded defendant knocking on the front door, then unsuccessfully attempting to open it before walking to the back of the house out of view of the camera, and then leaving several minutes later. The following day, July 29, defendant went on a fishing trip to eastern Oregon with his cousin, Smith.

On August 6, 2008, police entered Cooper and Kotkins's townhouse after responding to a utility company employee's report of a foul smell coming from the home. Inside, they discovered the badly decomposed bodies of the victims. Kotkins's body was found just inside the front door. Cooper's body was found in the living room, less than 10 feet away. Each of the victims had died of a single gunshot wound to the head. The bullets recovered from the bodies were both fired from the same weapon, and were consistent with having been fired from a Smith & Wesson 637 revolver. No gunshot residue was found, suggesting that these were not "contact" shots. Due to the decomposition of the bodies, the medical examiner was not able to ascertain the date of death.

Inside the home, police discovered $7,000 in cash, illegal narcotics, records of drug sales, a partially empty bottle of orange juice, and a pack of cigarettes. The police also found an empty gun case with an envelope stating that it was for a Smith & Wesson 637 revolver. Defendant's fingerprint was on the gun case. There was no sign of forced entry.

Around the time that the police discovered the bodies, a neighbor of Cooper and Kotkins provided police with the license plate number of a truck—subsequently determined to be defendant's—that, according to the neighbor, was often seen near the victims' home in the months leading up to the killings. Based on that information, the police contacted defendant, who agreed to be interviewed.

The police ultimately interviewed defendant four times, on August 6, 7, 8, and 13. During the first interview,

after a detective reassured defendant that the police were interested only in solving the murders, not drug offenses, defendant admitted that he sold narcotics for Cooper. Defendant did not mention that he had seen Kotkins early in the morning on July 24. Defendant did state that he had stopped by the townhouse on July 30, but left after finding no one home.

In the second interview, defendant revealed that he had visited Kotkins at home early in the morning on July 24. According to defendant, he dropped off a backpack containing $22,000 in cash with Kotkins at about 2:30 a.m. Defendant also declared several times that he had not stopped anywhere on his trip to the coast to meet his family later that evening.

In the third interview, defendant initially repeated his claim that he had left the backpack of cash with Kotkins on the morning of July 24. Later in the same interview, defendant abruptly amended his account and asserted that Kotkins had actually given the backpack back to him and that he had it with him at the convenience store he visited a short time later. Defendant also stated that he had stopped by Cooper's residence on July 28 and not, as he had previously indicated, on July 30. Defendant recounted ringing the doorbell several times and then leaving from the front porch when no one answered. At that point, the detective interviewing defendant confronted defendant with the suggestion that somebody had seen him go around to the back of the townhouse on July 28 and let Cooper's dog into the home through the back door. Defendant then confirmed that he had in fact let the dog in, and that, upon entering the residence, he saw Cooper's corpse on the living room floor, panicked, and ran.

The investigation continued for several months. On March 3, 2009, defendant's cousin, Smith, informed police that defendant had confessed to killing Cooper and Kotkins. According to Smith's testimony later at trial, defendant told Smith that "he killed [Kotkins] first, went to the jail, picked up [Cooper], brought him back, [and] killed him" and that he had done so in order to take over their drug business.

The police arrested defendant on March 6, 2009, and defendant learned then that Smith had provided information against him. In June 2009, while in pretrial custody, defendant met a fellow inmate, Cunningham. On June 25 and 26, defendant placed several phone calls to his wife, asking her to deliver a manila envelope of cash to a woman named Osburn at the hospital in Portland where Osburn worked. The police, who were monitoring defendant's calls, learned that Osburn was Cunningham's mother and that the money was to be given to Osburn so that she could bail Cunningham out of jail. Cunningham notified his mother by phone that she would receive the money, and on June 29, Osburn forwarded it to her son who used it to make bail. Detectives were waiting for Cunningham when he was released from jail early the next morning, and they warned Cunningham that they would be looking for him if there were "any issues" with Smith.

Defendant's trial began in late July 2009. Several months later, while *voir dire* proceedings were still being conducted, Cunningham contacted the police. As Cunningham would ultimately testify at trial, he informed the police that defendant had offered to bail Cunningham out if Cunningham would then kill Smith, but that Cunningham had decided not to follow through with the scheme after detectives warned him away when he was released from jail.

Another witness, Weismandel, who bought drugs from defendant, told police that defendant had spoken to him about rumors of defendant's involvement in the murders. Weismandel suggested that defendant had admitted to committing the murders; according to Weismandel, defendant assured him, "I did what I did to protect my family." At trial, Weismandel testified that defendant said that he had done it because Cooper had threatened to hurt defendant's wife.

The state argued to the jury that the evidence demonstrated beyond a reasonable doubt that defendant had planned to kill Kotkins and Cooper to take over their drug business. According to the state's theory, it would be easier to kill the victims separately, so defendant killed Kotkins the night before Cooper was released from jail.

Killing Kotkins first enabled defendant to be the one to pick up Cooper when he was released from jail less than seven hours later. After escorting Cooper to get his hair cut and other stops, defendant took Cooper back to the townhouse, entered with him through the back door, and then moments later shot and killed Cooper at the spot where Cooper could see his wife's body.

As noted, the jury found defendant guilty of, *inter alia*, two counts of aggravated murder. On the aggravated murder counts, the trial court sentenced defendant to consecutive life sentences with the possibility of parole after 30 years.

On appeal, defendant renews the argument he made at trial that the evidence was insufficient to permit the jury to conclude that the murders of Kotkins and Cooper occurred during the same criminal episode. According to defendant, the murders were not, as required by ORS 131.505(4), "directed to the accomplishment of a single criminal objective[,]" and they did not constitute "continuous and uninterrupted conduct." Defendant contends, more specifically, that his objective, to "advanc[e] his criminal career," was too "broad," "distant," and abstract—not discrete enough—to be considered singular.[1] Defendant argues, additionally, that the gap in time between the murders forecloses the conclusion that his conduct was "continuous and uninterrupted."

The state responds that the evidence regarding the two killings, viewed in the light most favorable to the state, would permit a rational factfinder to conclude that defendant planned both murders as part of a premeditated scheme to eliminate Cooper and Kotkins in order to usurp their drug business and that defendant's execution of that plan consisted of a sufficiently continuous and uninterrupted course of conduct unified in time, place, and circumstances. We agree.

In analyzing the meaning and scope of ORS 131.505(4), we look to the text of that statute, in context. *Friends of Yamhill County v. Yamhill County*, 229 Or App 188,

---

[1] We reject out of hand defendant's alternate characterization of his objective, and the related argument that, "[e]ven assuming both *murders* were fueled by defendant's lust for money and power, a common *non-criminal* motive is not the same thing as a single criminal objective for purposes of ORS 131.505(4)." (Emphasis added.)

192, 211 P3d 297 (2009). Context includes pertinent legis-
lative history, *State v. Blair*, 348 Or 72, 80, 228 P3d 564
(2010), as well as prior judicial interpretations of the stat-
ute, *Liberty Northwest Ins. Corp., Inc. v. Watkins*, 347 Or 687,
692, 227 P3d 1134 (2010).

As mentioned, a "criminal episode" is defined for
purposes of aggravated murder as, "continuous and unin-
terrupted conduct that establishes at least one offense and
is so joined in time, place and circumstances that such con-
duct is directed to the accomplishment of a single criminal
objective." ORS 131.505(4). Thus, the statutory text defining
"criminal episode" establishes that there are two prerequi-
sites, both of which must be met, for a given course of conduct
to constitute a criminal episode. First, such conduct must
be "continuous and uninterrupted" (and, as defendant does
not dispute is the case here, establish at least one offense).
Second, such conduct must be "directed to the accomplish-
ment of a single criminal objective." The text further estab-
lishes that the degree to which the conduct is "joined in time,
place and circumstances" shall be considered in assessing
the criminal objective.

We address the "single criminal objective" prerequi-
site first. "The determination of whether the conduct is
'directed to the accomplishment of a single criminal objec-
tive' is an objective determination." Commentary to Criminal
Law Revision Commission Proposed Oregon Criminal Pro-
cedure Code, Final Draft and Report § 26, 17 (Nov 1972)
(Commentary). In other words, "the subjective intent of the
person should not be considered in determining whether or
not a certain offense was part of the criminal episode." *Id.*
Instead, the determination depends on "what reasonably
appeared under the circumstances to be within a single
criminal objective." *Id.* In this case, a rational trier of fact,
viewing the evidence in the light most favorable to the state,
could have found that defendant's conduct was, as the state
theorized, directed to a single criminal objective, namely,
the premeditated murder of both Cooper and Kotkins to
gain control of their drug-dealing business.

Defendant argues that the separate killings of two
different individuals necessarily connotes multiple criminal

objectives; *i.e.*, the criminal objective of killing the first victim and the separate, additional criminal objective of killing the second person. However, the possibility of "deconstructing" a criminal objective into component parts, or "subobjectives," does not undermine our conclusion in this case that defendant's conduct was directed to the accomplishment of a single criminal objective. As a textual matter, the legislature's use of the indefinite article "a" in the statutory text—"a single criminal episode"—can be understood to denote, in effect, one criminal episode among several. *See Webster's Third New Int'l Dictionary* 1 (unabridged ed 2002) (defining "a" to mean, *inter alia*, "ANY, EACH"). By the same token, the word "single" can refer to something "taken by itself apart from its group or constituency : DISTINCT, SEPARATE." *Id.* at 2123. It is true that both of those words, and thus the phrase, are also susceptible to an interpretation that the statutory text requires the existence of "no more than one" criminal objective, as opposed to "at least one" criminal objective. Any ambiguity, however, is resolved by resort to the legislative history of ORS 131.505(4), as well as prior judicial interpretation of the phrase "a single criminal objective."

As that legislative history and case law illustrate, "a single criminal objective" may encompass multiple related, though distinct, criminal objectives; in particular, that is so when, as in this case, the separate crimes are committed in service of an ultimate and discrete criminal goal. In legislative commentary from the Criminal Law Revision Commission, the drafters of ORS 131.505(4) provided several examples designed to clarify the meaning of "a single criminal objective." Commentary § 26 at 17-18. As we have previously noted,

> "[f]or example, on hypothetical facts of a defendant who enters a convenience market at night, robs the market by making the lone female clerk give him the money, and then takes the clerk to the back room and rapes her, the commission commentary states that the defendant's conduct * * * could be considered as a single criminal episode if the defendant's objective is viewed as rape, with the robbery preliminary to the rape, or if the defendant's *overall* objective was to commit both robbery and rape. [Commentary] at 17-18."

*State v. Burns*, 259 Or App 410, 422, 314 P3d 288 (2013), *appeal dismissed*, 261 Or App 113, 323 P3d 275 (2014) (emphasis added). Based on the same examples, Justice Walters recently observed in her concurrence to the Supreme Court's per curiam dismissal of the petition for review in *State v. Campbell*, 354 Or 375, 379, 312 P3d 511 (2013) (Walters, J., concurring), that "a 'single criminal objective' is not a narrow concept: Two or more offenses may be directed toward more than one criminal objective and still be part of the same criminal episode, as long as they reasonably can be seen to be directed toward a single overarching criminal objective."

Our decision in *State v. Witherspoon*, 250 Or App 316, 280 P3d 1004 (2012), is also instructive. In that case, the defendant was convicted of one count of menacing and two counts of assault following a prolonged domestic violence episode that endured for more than five hours and involved numerous separate acts by the defendant against the victim. *Id.* at 318-19. We held that the menacing and assault "shared a common criminal objective of harassing and injuring the victim through physical and emotional abuse." *Id.* at 324; *see also State v. Kautz*, 179 Or App 458, 467, 39 P3d 937, *rev den*, 334 Or 327 (2002) (although the "defendant may have acquired an additional criminal objective to escape when confronted by [the victim], his earlier objective to steal [the victim's] property continued during the course of all of the events").

Defendant invokes several cases—in particular, *State v. Hathaway*, 82 Or App 509, 728 P2d 908 (1986), *rev den*, 302 Or 594 (1987), and *State v. Sparks*, 150 Or App 293, 946 P2d 314 (1997), *rev den*, 326 Or 390 (1998)—that, he contends, demonstrate that there is not "a single criminal objective" when a defendant commits separate crimes that are not contemporaneous, whether or not those crimes are aimed at the same, overarching criminal objective. However, we have already rejected similar efforts to utilize those cases to circumscribe the scope of the definition of "single criminal objective" in ORS 131.505(4). *See Burns*, 259 Or App at 428-29. In *Burns*, we specifically rejected the same argument that defendant advances here as "not consonant with * * * the

definition of 'criminal episode.'" *Id.* at 429. It is also at odds with the import of *Witherspoon* and the legislative history, neither of which defendant attempts to distinguish.

Defendant also relies on another case, *State v. Kessler*, 297 Or 460, 686 P2d 345 (1984), to support his argument. In *Kessler*, in the context of cumulative sentencing, the Supreme Court held that six kidnappings, four of lay ministers to obtain their civilian clothes and two of corrections officers used as hostages, at "successive stages of the escape," were subject to six separate and consecutive sentences. *Id.* at 467. Defendant describes *Kessler* as holding that kidnappings undertaken in furtherance of an escape were not part of the same criminal episode when each kidnapping had an intermediate objective in the larger scheme toward the ultimate objective of escape.

The facts and analysis in *Kessler* pertained to criminal conduct affecting multiple victims. *Id.* at 466-67. Regarding the first set of kidnappings, the court stated, "Each of the civilian victims was summoned for a purpose, to obtain his clothing for one of the prisoners. Each was locked up in order to prevent interference with the escape. *This kidnapping episode* achieved its intermediate object in the larger scheme toward the ultimate objective of escape." *Id.* at 467 (emphasis added). As that passage indicates, the Supreme Court appears to have concluded that criminal conduct directed at multiple victims may serve an "intermediate object[ive] in [a] larger scheme toward [an] ultimate objective" and thus may constitute part of a single criminal objective. However, the court also observed that the kidnappings "happened in successive stages of the escape[,]" *id.*, and that "the test of a single criminal objective is no panacea," *id.* at 465. The court concluded that the "role of kidnapping in this case is closer to that in *State v. Garcia*, [288 Or 413, 605 P2d 671 (1980)], which sustained a separate sentence for a kidnapping preceding a series of sex offenses in the same episode, than it is to [*State v. Linthwaite*, 295 Or 162, 665 P2d 863 (1983)]." *Kessler*, 297 Or at 468. The court in *Garcia* had held that, in accordance with legislative intent, a separate conviction and sentence for a kidnapping is proper when it is not incidental to another crime, as is the case when the defendant

"had the intent to interfere substantially with the victim's personal liberty" and that, because the jury concluded that the defendant had that intent, his separate sentence for the kidnapping conviction was affirmed. 288 Or at 423. Given the court's reliance on *Garcia*, in our view, *Kessler* does not assist defendant with respect to whether there was a "single criminal objective."

A closer question arises when we consider whether, viewing the facts in the light most favorable to the state, a rational trier of fact could have found, beyond a reasonable doubt, the second prerequisite for the conclusion that defendant committed the murders during the "same criminal episode," that is, that defendant's conduct in carrying out his criminal objective was "continuous and uninterrupted." Arguing that his conduct was not continuous and uninterrupted, defendant highlights the 12-hour gap that the state theorizes separated the two killings. That argument presumes a specific interpretation of what constitutes the "conduct" in which defendant engaged to accomplish his criminal objective—an interpretation that narrowly regards each discrete killing as the requisite, and separate, instances of conduct to be considered for purposes of ORS 131.505(4). Under such an interpretation, the mere gap in time between the two killings might suffice to support a conclusion that no reasonable trier of fact could find that defendant's conduct was continuous and uninterrupted.

However, we conclude that, under the circumstances particular to this case, defendant's "conduct" refers to the entire course of conduct that began with the killing of Kotkins and concluded with the murder of Cooper. That interpretation is consonant with the plain meaning of the word "conduct," which is defined as "the act, manner, or *process of* carrying out (as a task)." *Webster's* at 473 (emphasis added). Again, *Witherspoon* is instructive. The defendant's actions in that case encompassed a series of separate acts of domestic violence against the victim. 250 Or App at 318-19. Different acts by the defendant served as the bases for distinct charges against him. *Id.* We rejected the argument that the defendant's offenses arose from separate criminal episodes and, instead, concluded that the defendant's conduct was "continuous and uninterrupted." *Id.* at 326.

Given that understanding, we conclude that, for purposes of determining whether defendant killed both victims in the same criminal episode, defendant's conduct here can be viewed as continuous and uninterrupted. The state argued at trial, and does so again on appeal, that defendant formulated the plan to kill *both* Kotkins and Cooper in advance of killing either one; the purpose behind killing them was to usurp their drug-dealing business; his premeditated plan involved killing the victims in the specific manner and on the particular timeline that the murders, in fact, took place; and, perhaps most significantly, his actions in between the time Kotkins and Cooper were killed—including the actions that defendant implicitly argues interrupted his conduct (*i.e.*, picking up Cooper and taking him to run errands before returning with him to the townhouse and shooting him)—were taken *in service of* his overarching objective in a still relatively short amount of time that was *as short as practicably possible.* That is to say, the state urged the jury to find that defendant spent the time in between the killings engaged in conduct that he had calculated was necessary to successfully complete, and escape culpability for, the second killing and thereby accomplish his overall objective.

The state adduced evidence to support its theory. Based on that evidence, a rational trier of fact could conclude beyond a reasonable doubt that, as the state argued at trial, defendant killed Kotkins at the latest possible point in time before Cooper's release that he could, thereby (1) minimizing the chance that that killing would be discovered before Cooper's release, or by Cooper after his release and (2) creating the need and thus opportunity for defendant, rather than Kotkins, to pick Cooper up from jail. For defendant to then kill Cooper without inviting undue suspicion, the jury could have concluded that defendant deliberately, and according to plan, ferried Cooper from errand to errand before ultimately returning with him to the townhouse, walking in the back door with him and then shooting him after entering, when Cooper would have first noticed his wife's body near the front door.

We conclude that, in light of (1) the state's theory that defendant's criminal objective involved a premeditated scheme to accomplish an overall objective that required

successful completion of component acts or offenses and (2) the fact that those acts or offenses took place over a relatively short amount of time during which defendant's conduct may be reasonably characterized as necessary to effect each of the component acts and the overarching objective too, defendant's conduct can be characterized as having been "continuous and uninterrupted" for purposes of establishing that two murders took place during the "same criminal episode." The trial court did not err in denying defendant's MJOA.

## II.  DEMONSTRATIVE EVIDENCE

At trial, the state elicited testimony from Ward, the owner of the gun store at which defendant, along with O'Day, purchased the gun that the prosecution alleged defendant used to kill Kotkins and Cooper. In his fourth assignment of error, defendant contends that the trial court erred when it allowed Ward to use a gun similar to the murder weapon to demonstrate to the jury how a laser sight like the one on the alleged murder weapon functioned. Defendant argues that the demonstration was not relevant and asserts that, even if it was, it was unfairly prejudicial. The state counters that the demonstration was relevant to disprove defendant's theory that the killings were the result of a murder-suicide and that it did not result in unfair prejudice. We review the trial court's determination of relevance for errors of law. *State v. Davis*, 336 Or 19, 25, 77 P3d 1111 (2003). We review the determination regarding unfair prejudice for abuse of discretion. *State v. Mason*, 100 Or App 240, 243, 785 P2d 378 (1990).

The following additional facts pertaining to this assignment of error are not disputed. Ward testified at trial that O'Day had purchased a Smith & Wesson Model 637 revolver equipped with a laser sight from his gun shop on June 2, 2008. During his testimony, Ward used a handgun of the same make and model, and with the same kind of laser sight, as that sold to O'Day to demonstrate specifically how the laser sight worked. The gun contained no ammunition and, as the jury was informed, was rendered inoperable by a cable running through the barrel and the cylinder. To demonstrate the laser sight, Ward pointed the gun at a blank sheet of paper on an easel located away from the jury.

By holding the gun and depressing a button on the grip, Ward demonstrated, a red dot would appear on the point at which the gun's barrel was aimed. Before that testimony, defendant moved to prevent the state from having Ward use the gun as demonstrative evidence. The court overruled defendant's objection.

One of the theories advanced by defendant regarding the deaths of Kotkins and Cooper was that Cooper might have killed Kotkins and then turned the gun on himself. Defendant acknowledged that evidence tending to prove that Cooper was shot from some distance would likely "exclude suicide." We agree with the state that Ward's demonstration was relevant under OEC 401[2] to illustrate that a third person could have shot Cooper using the laser sight, thus undermining defendant's murder-suicide theory.

Defendant contends, however, that the evidence should have been excluded pursuant to OEC 403. Under OEC 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice," meaning "an undue tendency to suggest decisions on an improper basis, commonly although not always an emotional one." *State v. Bowen*, 340 Or 487, 519, 135 P3d 272 (2006), *cert den*, 549 US 1214 (2007) (internal quotation marks omitted). Defendant fails to actually articulate *how* Ward's demonstration was unfairly prejudicial, merely asserting at trial and again now on appeal that, for example, "[a] gun has a powerful effect on a jury." In any case, given the above definition of unfair prejudice, the relevance of the demonstration, the safety precautions taken by the state, and the manner in which the demonstration was conducted, we readily conclude that the trial court did not abuse its discretion in permitting the demonstration.

### III. RULE OF COMPLETENESS

We turn finally to the last of defendant's assignments of error that we address. Defendant argues that the trial court erred in denying his request under OEC 106 that

---

[2] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401.

he be permitted to introduce certain statements that he made during his interviews with police. The state responds that the trial court properly rejected defendant's assertion that the OEC 106 "rule of completeness" required the court to admit those statements. We review for errors of law. *State v. Charboneau*, 323 Or 38, 49, 913 P2d 308 (1996).

As already noted, the police interviewed defendant several times in the days following the discovery of the victims' bodies, during which defendant offered various accounts of his conduct during the period of July 24 to 28, 2008. Defendant did not contest the admissibility of those statements and does not do so on appeal. During the same interviews, defendant also made other statements in which he stated that Cooper, through his drug business, had dealings with certain dangerous individuals who defendant suggested might have killed Cooper and Kotkins. Anticipating that defendant would seek admission of those statements pursuant to OEC 106, the state filed a motion *in limine* to exclude them as inadmissible hearsay. The trial court granted the state's motion, concluding that, "with respect to those issues that have been identified that the Defendant seeks to offer under Rule 106 ***, the State's Motion in Limine is granted. None of it comes in under the Rule of Completeness."

Under OEC 106,

"[w]hen part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject, where otherwise admissible, may at that time be inquired into by the other; when a letter is read, the answer may at that time be given; and when a detached act, declaration, conversation or writing is given in evidence, any other act, declaration, conversation or writing which is necessary to make it understood may at that time also be given in evidence."

As we have previously noted, OEC 106 "is designed to prevent evidence from being presented to a jury out of context." *State v. Batty*, 109 Or App 62, 70, 819 P2d 732 (1991), *rev den*, 312 Or 588 (1992). However, OEC 106 does not apply to allow admission of supplementary evidence that is otherwise inadmissible. *Id.* Defendant concedes that the

statements he sought to have introduced "were inadmissible hearsay." Therefore, OEC 106 did not supply a basis for their admission, and the trial court did not err in so ruling.

Defendant argues for the first time on appeal that he was nevertheless entitled to have the statements admitted to protect his right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Defendant did not raise that argument at trial, and we will thus not address it on appeal. ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court ***.").

Affirmed.