TOOKEY, J.
*461 Defendant appeals a judgment of conviction for, among other offenses, three counts of coercion (Counts 1 to 3), ORS 163.275, and one count of felony assault in the fourth-degree constituting domestic violence (Count 5), ORS 163.160(3). The trial court sentenced defendant to 36 months' imprisonment on each of Counts 1 to 3 under 7-A on the sentencing guidelines grid block to be served concurrently, and 30 months' imprisonment on Count 5 under 6-A on the sentencing guidelines grid block to be served consecutively to Counts 1 to 3. On appeal, defendant assigns error to the trial court's calculation of his criminal history score on Count 5. Defendant contends that the trial court "erred when it found that Count 5 arose in a separate criminal episode and refused to apply the 'shift-to-I' rule when imposing a consecutive sentence on Count 5."[1]
*940 For the reasons that follow, we conclude that the record does not support the trial court's conclusion that Counts 1 to 3 were separate from Count 5 for purposes of applying the "shift-to-I" rule. We therefore remand for resentencing and otherwise affirm.
"The question of whether events constitute a single criminal episode is a question of law ***." State v. Burns , 259 Or. App. 410, 420, 314 P.3d 288 (2013), recons. den. and appeal dismissed , 261 Or. App. 113, 323 P.3d 275 (2014). In this case, the facts are not in dispute. Thus, we "review the court's application of the law to those facts for legal error." Id. at 421, 314 P.3d 288.
At the time that defendant committed the crimes in this case, he was on supervision and had previously been convicted for prior acts of domestic violence against the victim. As a result of that supervision, he was prohibited from having contact with the victim and prohibited from drinking alcohol. Additionally, at the time that he committed the crimes in this case, defendant had active warrants for his arrest.
*462 Notwithstanding the prohibitions on his conduct due to his supervision, on the evening of August 13, 2015, defendant and the victim were drinking together in the victim's apartment. Also present in the apartment was the victim's two or three-month-old infant, H. At some point after 1:00 a.m. on August 14, 2015, defendant fell asleep.
After defendant fell asleep, the victim went into the bathroom. Shortly thereafter, defendant woke up and went into the bathroom as well. Defendant grabbed the victim with one hand in the throat and jaw area, which cut off her breathing. Defendant then lifted the victim off the toilet by her throat, carried her out of the bathroom to the living room-a distance of 15 to 25 feet-and threw her on a couch. The time between when defendant lifted the victim off the toilet and when he threw her on the couch was approximately 10 to 15 seconds. Defendant then struck the victim while she was on the couch.
The victim attempted to leave the apartment and got as far as the porch before defendant intercepted her, grabbed her and brought her back into the apartment. Shortly thereafter, H woke up. The victim picked H up, and while she was holding H, defendant grabbed the victim by the neck and pushed her against a wall.
The victim then called 9-1-1 on her cell phone. Defendant, aware that the victim was calling the police, advanced on the victim. Defendant's demeanor, coupled with the fact that he was moving toward the victim, "convinced [the victim] that if she didn't terminate the call quickly that there could be an escalation of the physical *** violence that had already occurred." The victim ended the call "after providing police with only the address of the residence." Defendant then grabbed the victim's phone and broke it into three pieces. After that, he grabbed the victim again and pushed her onto the couch.
The victim attempted to leave the apartment for a second time. She made it to a neighbor's door, where defendant "caught up with her, grabbed her again *** [in] a bear hug hold[,] and dragged her back to the porch of her residence." Shortly after that, police arrived in response to the *463 terminated 9-1-1 call. Defendant, who had reentered the apartment at some point, did not come out of the apartment for between 30 seconds to a minute. He was then taken into custody.
Defendant was indicted for multiple crimes, including, as relevant to this appeal, three counts of coercion (Counts 1 to 3), ORS 163.275, one count of felony assault in the fourth-degree (Count 5), ORS 163.160(3), and one count of felony strangulation (Count 7), ORS 163.187. After a bench trial, the trial court found defendant guilty of those crimes. The trial court explained when pronouncing its verdict that the first act of coercion, Count 1, "related to the first time that [defendant] took [the victim] back into the house," when he "physically grabbed her back into the residence." The second act of coercion, Count 2, related to "the event involving the breaking of the cellphone." The trial court noted that it did not "find the *941 breaking of the cellphone itself to be the coercive act," but that it was "part of a series of acts that support coercion," including that "when [the victim] was making the call the defendant *** came at her with what she testified *** was a look on his face that indicated to her that if she didn't stop the call that the situation could escalate," and that by grabbing and breaking the phone he indicated "by his physical acts that any further attempt to call 9-1-1 would be met with similar aggression." The third act of coercion, Count 3, occurred when "defendant grabbed [the victim, and] dragged her again back into her porch area" the "second time that [she] attempted to leave the residence." The trial court explained that for both Count 1 and Count 3 it considered defendant's conduct to be coercion not only because he grabbed the victim, but also because defendant was "larger *** and significantly stronger" than the victim and because of "previous encounters with [defendant]" where "something had occurred that had left bruising on [the victim] from [defendant]."
The trial court explained that defendant committed felony assault in the fourth degree, Count 5, and felony strangulation, Count 7, when he "cut off [the victim's airway] for what appears to be [10] to 15 seconds." The state requested that the trial court clarify whether its findings of *464 guilt on Count 5 and Count 7 related to the same or separate incidents of strangulation. The court replied,
"[a]t this point I don't find on the two strangulations that there was [a]significant break in the activity to make it two separate incidences. It appears that it occurred over a relatively short period of time and so I do find that *** the conduct regarding removing [the victim] from the bathroom by her throat and putting her against the wall by her throat constitute an uninterrupted criminal episode."
As noted above, at defendant's sentencing hearing, the trial court sentenced defendant to 36 months' imprisonment, to be served concurrently, on each of Counts 1 to 3 under 7-A on the sentencing guidelines grid block.[2] It also sentenced defendant to 30 months' imprisonment on Count 5 under 6-A on the sentencing guidelines grid block to be served consecutively to each of Counts 1 to 3. The trial court concluded that a consecutive sentence on Count 5 was "appropriate" because, although Counts 1 to 3 and Count 5 were part of a continuous and uninterrupted course of conduct, defendant's conduct "indicat[ed] a willingness to *** commit more than one criminal offense." See ORS 137.123 (5)(a) (permitting "consecutive terms of imprisonment for separate convictions arising out of a continuous and uninterrupted course of conduct" where "the criminal offense for which a consecutive sentence is contemplated was *** an indication of defendant's willingness to commit more than one criminal offense"). Additionally, the trial court rejected defendant's argument that it should apply the "shift-to-I" rule when sentencing defendant to a consecutive sentence on Count 5. The trial court reasoned that the "shift-to-I" rule was inapplicable because defendant had "two specific objectives ***, one of which was to cause [the victim] physical injury and the other one was to prevent her from escaping or reporting the crime."
On appeal, defendant argues that the trial court erred when it concluded that the "shift-to-I" rule did not apply when calculating defendant's criminal history score on Count 5. Defendant argues that if the "shift-to-I" rule *465 applied in this case, the presumptive sentence for Count 5 would be a "three-year probationary sentence." As we have explained,
"[t]he 'shift-to-I' rule applies when a defendant is sentenced for multiple felonies in the same proceeding. In that event, the defendant's true criminal history score is used in assessing the grid block for imposing sentence on the primary offense (and any other offenses for which sentences will run concurrently). OAR 213-012-0020(2)(a)(A). For additional offenses for which consecutive sentences will be imposed, the court is required to use the criminal history score 'I.' OAR 213-012-0020(2)(a)(B)."
*942 State v. Mayes , 234 Or. App. 707, 709 n. 1, 229 P.3d 628, rev. den. , 348 Or. 669, 237 P.3d 824 (2010).
The "shift-to-I" rule applies, however, only "when consecutive sentences are imposed for crimes that arise from a single criminal episode." Orchard v. Mills , 247 Or. App. 355, 358, 270 P.3d 309 (2011), rev. den. , 352 Or. 33, 281 P.3d 611 (2012). In determining whether crimes arise from a "single criminal episode," we "rely on the statutory definition of 'criminal episode' that governs our double jeopardy analysis, ORS 131.505(4)." Welsh v. Taylor , 284 Or. App. 387, 393, 392 P.3d 366, rev. den. , 361 Or. 886, 403 P.3d 773 (2017). That statute provides:
" 'Criminal episode' means continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective."
ORS 131.505(4).
Thus, under ORS 131.505(4), there are two prerequisites for a given course of conduct to constitute a single criminal episode. "First, such conduct must be 'continuous and uninterrupted' ***." State v. Tooley , 265 Or. App. 30, 39, 333 P.3d 348, rev. den. , 356 Or. 575, 342 P.3d 88 (2014) (quoting ORS 131.505(4) ). "Second, such conduct must be 'directed to the accomplishment of a single criminal objective.' " Id. (quoting ORS 131.505(4) ). The "text further establishes the degree to which the conduct is 'joined in time, place and circumstances' shall be considered in assessing the criminal objective." Id. (quoting ORS 131.505(4) ).
*466 On appeal, the state does not dispute that Counts 1 to 3 and Count 5 were part of a continuous and uninterrupted course of conduct. Accordingly, whether the Counts 1 to 3 and Count 5 were part of the same criminal episode turns on whether defendant's conduct in coercing and assaulting the victim was "directed to the accomplishment of a single criminal objective." See ORS 131.505(4).
Our decision in State v. Witherspoon , 250 Or. App. 316, 280 P.3d 1004 (2012), is particularly instructive in resolving the question before us. In Witherspoon , we applied ORS 131.505(4) in the context of an episode of domestic violence that lasted for more than five hours. Id. at 318-19, 323, 280 P.3d 1004. During that time, the defendant had "grabbed [the victim's] hair and pulled her head back, aggravating a bulging disc in her neck, *** referr[ed] to her in derogatory terms," "pulled a kitchen knife out of a drawer and forcibly placed it in her hand, yelling at her to stab him with it," pulled a phone cord out of the wall when the victim was attempting to call 9-1-1 for help, and threw the victim against a bookshelf when she was attempting to leave her residence with her child. Id. at 318-19, 280 P.3d 1004. The defendant was convicted of three crimes: (1) misdemeanor assault, for pulling the victim's head back and aggravating her neck injury; (2) menacing, for placing the victim in fear of imminent physical injury when he shook her and displayed a knife; and (3) felony fourth-degree assault, for throwing the victim against the bookshelf. Id. The trial court in Witherspoon concluded that the misdemeanor assault and the menacing occurred during the same criminal episode, but that the felony assault was part of a separate criminal episode. Id. at 319-20, 280 P.3d 1004. Consequently, when sentencing defendant on the felony assault charge, it sentenced defendant on the sentencing guidelines grid block using a criminal history score that included both the misdemeanor assault and menacing convictions. Id.
We reversed, holding that, because the menacing and felony assault charges "arose from continuous and uninterrupted conduct by defendant that was joined in time, place, and circumstances," and that "shared a common criminal objective of harassing and injuring the victim through physical and emotional abuse," the "record [did] not support *467 the trial court's conclusion" that those charges constituted separate criminal episodes. Id. at 323-24, 326, 280 P.3d 1004. In so holding, we recognized that when a defendant's initial criminal objective "continue[s] throughout the [criminal] episode," the addition of another objective does not support a conclusion that there were multiple criminal episodes. See id. at 325, 280 P.3d 1004 ("[D]efendant may have acquired the additional *943 objective in [their child's] bedroom *** to stop [the victim] from taking [their child] with her as she tried to flee from defendant, [but] defendant's earlier and ongoing criminal objective to harass and abuse [the victim] continued throughout the episode."). Additionally, we recognized that "proper application" of ORS 131.505(4) requires that we "focus on [a defendant's] overarching criminal objective," notwithstanding new criminal objectives that a defendant may develop during the course of a criminal episode. Id. at 325 n. 6, 280 P.3d 1004 (the defendant's "conduct in ripping the telephone cord out of the wall *** did, in fact, add a new criminal objective to the criminal episode," however, "the addition of another criminal objective does not detract from the focus on the overarching criminal objective that is required"); see also Tooley , 265 Or. App. at 40, 333 P.3d 348 ("As that legislative history and case law illustrate, 'a single criminal objective' may encompass multiple related, though distinct, criminal objectives; in particular, that is so when *** the separate crimes are committed in service of an ultimate and discrete criminal goal.").
Guided by our decision in Witherspoon , we conclude that the record in this case does not support the trial court's conclusion that Counts 1 to 3 were part of a separate criminal episode from Count 5. To the contrary, the record demonstrates that defendant's conduct was similar to that of the defendant in Witherspoon , and that the conduct underlying Counts 1 to 3 and Count 5 in this case, like the conduct underlying the menacing and felony assault convictions in Witherspoon , was directed toward a common criminal objective of "harassing and injuring the victim." 250 Or. App. at 324, 280 P.3d 1004. Defendant's first act of coercion-dragging the victim back into her apartment from her porch after the first time she tried to escape-was bookended by two acts: (1) defendant removing the victim from the bathroom by her throat cutting off her breathing for 10 to 15 seconds and *468 (2) defendant putting the victim against the wall by her throat. Those two acts, as the trial court found, were part of an uninterrupted criminal episode, which overlapped with the first act of coercion. Defendant's second act of coercion-putting the victim in fear of physical violence while she was calling 9-1-1 and breaking her phone-was followed by another act: defendant shoving the victim onto the couch. While defendant's third act of coercion was not directly followed by further acts against the victim, law enforcement officers had arrived shortly after that coercive act, preventing further acts by defendant.
Consideration of the "time, place, and circumstances" also supports our conclusion that defendant had a single, overarching criminal objective. Regarding time, the conduct constituting defendant's crimes in this case occurred over the course of a single night. See Tooley , 265 Or. App. at 43-44, 333 P.3d 348 (two murders, separated in time by 12 hours, were part of the same criminal episode because, despite the defendant's distinct intent to kill each person, the defendant had the same overarching criminal objective when he committed the murders: to take over the victims' drug-dealing business). Regarding place, the conduct occurred in a single apartment and the area immediately surrounding the apartment. See Witherspoon , 250 Or. App. at 318-20, 326, 280 P.3d 1004 (acts of domestic violence that took place in various rooms in the victim's residence and lasted for more than five hours were part of a single criminal episode). And, regarding circumstances, the trial court's findings of guilt on some of the counts of coercion were, as noted above, partially premised on the ongoing domestic violence that the victim had experienced at the hands of defendant.
The state argues that Witherspoon is distinguishable because in Witherspoon "the only criminal objective at issue was that of assaulting the victim." The state contends that, in this case, "defendant's acts of coercion served a separate criminal objective-preventing the victim from reporting the abuse, so that defendant could evade apprehension and punishment."
There are two problems with the state's argument. First, that kind of "parsing of defendant's criminal objective *469 is inconsistent with the intent of ORS 131.505(4)." State v. Kautz , 179 Or. App. 458, 467, 39 P.3d 937, rev. den. , 334 Or. 327, 52 P.3d 435 (2002) ; see *944 also Witherspoon , 250 Or. App. at 325, 280 P.3d 1004 ("[T]o accept that defendant's criminal objective changed over the course of the [domestic] abuse would improperly parse defendant's criminal objective.").
Second, even accepting that defendant developed the additional criminal objective posited by the state, the facts demonstrate that that purported objective furthered his primary, overarching objective, and, thus, was part of the same criminal episode. See Tooley , 265 Or. App. at 41, 333 P.3d 348 ("Two or more offenses may be directed toward more than one criminal objective and still be part of the same criminal episode, as long as they reasonably can be seen to be directed toward a single overarching criminal objective." (Internal quotation mark omitted.) ); Witherspoon , 250 Or. App. at 325 n. 6, 280 P.3d 1004 (the "addition of another criminal objective"-such as "interfering with making a report to a 9-1-1 emergency reporting system"-"does not detract from the focus on the overarching criminal objective that is required under a proper application of the standard that the legislature established in ORS 131.505(4)").
Furthermore, we note that the state argues that defendant's "strong incentive to avoid apprehension by the police"-evidenced by the fact that he "was on supervision at the time of this incident for previously assaulting the victim, he was not supposed to have contact with her, he was not supposed to be drinking alcohol, and had active warrants for his arrest"-suggests he had a separate criminal objective when engaging in the acts constituting coercion. But nearly every person who commits a felony has a strong incentive to avoid apprehension by the police. That incentive does not mean that crimes committed while attempting to avoid apprehension are part of a separate criminal episode where, as here, a defendant's initial criminal objective continues "during the course of all events." Kautz , 179 Or. App. at 467, 39 P.3d 937. Compare Orchard , 247 Or. App. at 357, 359, 270 P.3d 309 (second-degree assault, committed when the defendant recklessly hit another car while driving under the influence of intoxicants, and failure to perform the duties of a driver, committed *470 when the defendant fled the scene, were part of separate criminal episodes because " '[t]he reckless conduct and its result terminated at the time of the accident' " (quoting State v. Lopez , 56 Or. App. 179, 183, 641 P.2d 596, rev. den. , 293 Or. 146, 651 P.2d 143 (1982) ) ), with Kautz , 179 Or. App. at 460-61, 466-67, 39 P.3d 937 (burglary, committed when the defendant broke into the victim's workshop and stole property, and robbery, committed when the defendant pointed a gun at the victim while attempting to leave the scene of the robbery with stolen property, were part of a single criminal episode because, although the "defendant may have acquired an additional criminal objective to escape when confronted by [the victim], his earlier objective to steal [the victim's] property continued during the course of all events").
Because the conduct underlying Counts 1 to 3 and Count 5 was directed toward a common criminal objective, we conclude that the record does not support the trial court's conclusion that Counts 1 to 3 were separate from Count 5 for purposes of applying the "shift-to-I" rule.[3]
Remanded for resentencing; otherwise affirmed.

Defendant also assigns error to the trial court's imposition of "$60 as a 'court cost' or fine on one of defendant's convictions." We agree with defendant that that assignment of error has been rendered moot by the trial court's January 4, 2017, amended judgment.

See OAR 213-004-0001 (describing operation of sentencing guidelines grid block); OAR ch. 213, App. 1 (setting out the sentencing guidelines grid block).

Because we hold in favor of defendant on the basis of the statutory test for "criminal episode" in ORS 131.505(4), we do not reach defendant's argument regarding whether the "complete account" test for criminal episode is satisfied. See Burns , 259 Or. App. at 430 n. 8, 314 P.3d 288 ("Because we hold in favor of defendant on the basis of the statutory test for 'criminal episode' in ORS 131.505(4), we do not reach defendant's second argument, regarding whether the parallel 'cross-relation' test for 'criminal episode' is satisfied."). The "complete account" test and "cross-relation" test are synonymous. Witherspoon , 250 Or. App. at 322, 280 P.3d 1004.